2013 UT App 297

**Alan WILLEY, Plaintiff and Appellant,**

v.

**Walter F. BUGDEN Jr.; Tara L. Isaacson; and Bugden & Isaacson, LLC, Defendants and Appellees.**

**No. 20120623–CA.**

Court of Appeals of Utah.

Dec. 19, 2013.

Robb Jones and Andrew M. Bossory, for Appellant.

Stuart H. Schultz and Byron G. Martin, for Appellees.

Judge STEPHEN L. ROTH authored this Opinion, in which Judges JAMES Z. DAVIS and CAROLYN B. McHUGH concurred.

ROTH, Judge:

¶ 1 Alan Willey was convicted in 2007 of seven counts of aggravated sexual abuse of a child. He subsequently challenged his conviction on appeal, arguing that he received ineffective assistance of counsel when his defense attorney decided not to call a memory expert at trial. *See State v. Willey*, 2011 UT App 23, 248 P.3d 1014. That claim was rejected and his convictions affirmed by this court. *See id.* ¶ 1. Willey then sued his former attorneys, Walter F. Bugden Jr. and Tara L. Isaacson, and their law firm, Bugden & Isaacson, LLC (collectively, the attorneys) for legal malpractice. He claimed that by failing to call a memory expert at trial (the memory expert malpractice claims) and failing to communicate plea offers from the State (the failure to communicate claim), the attorneys violated the standard of care applicable to their representation of him. The district court granted the attorneys' motion for summary judgment, and Willey now ap-

peals. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## BACKGROUND

■ ¶ 2 This appeal is the latest development in an ongoing legal saga that began more than seven years ago. In April 2006, Willey, a long-time elementary school teacher, was charged with nine counts of aggravated sexual abuse of a child, a first degree felony.[1] *See* Utah Code Ann. § 76–5–404.1(4), (5) (LexisNexis Supp.2013).[2] One of Willey's former students (Child), in his early twenties at the time of the report, accused Willey of inappropriately touching him almost daily during the 1993–1994 school year. The attorneys represented Willey through two criminal trials—the first ended in a hung jury, and the second resulted in Willey's convictions on seven counts, which we affirmed on appeal. *See State v. Willey*, 2011 UT App 23, ¶¶ 18–20, 248 P.3d 1014.

¶ 3 The State's "primary witnesses" at both trials "were Child and four other students from his fourth grade class who recalled seeing" Willey inappropriately touch Child. *Id.* ¶ 3.[3] "At the first trial, the State also called six . . . witnesses who testified to having been similarly sexually abused by Willey when they were his students in different classes at different schools." *Id.* (citing Utah R. Evid. 404(b)). But "the State elected not to use these . . . witnesses" at the second trial, "having concluded that they distracted from the ultimate issue of whether Willey had sexually abused Child." *Id.*

¶ 4 After the first trial resulted in a hung jury, the State "widened its investigation . . ., interviewing twelve more of Child's former classmates," and investigating Willey's

---

1. "When reviewing an order granting summary judgment, the facts and all reasonable inferences that can be drawn from the facts are viewed in a light most favorable to the party opposing the motion." *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 998 (Utah 1991).

2. Throughout this opinion, we cite the current version of the Utah Code because no substantive changes have been made to the relevant statutory provisions that would affect the resolution of the issues presented on appeal.

3. Where the background facts underlying the summary judgment motion are not in dispute, we quote liberally from the factual description in our prior decision, *State v. Willey*, 2011 UT App 23, 248 P.3d 1014. The facts in that decision are based on Willey's rule 23B evidentiary hearing. Where the facts are in dispute, we draw from the record in the present case.

conduct while employed at another school district. *Id.* ¶¶ 4–5. Eight of Child's classmates "remembered that Willey would repeatedly rub Child's chest under his shirt," and "[o]ne of [them] further recalled that Willey would crouch down next to Child's desk." *Id.* ¶ 4. The State also "discovered notes handwritten by a school administrator from another school district where Willey had taught prior to the events involving Child. These notes confirmed that teachers and parents had complained that Willey was inappropriately touching boys in his classes." *Id.* ¶ 5. The school "received additional complaints about similar inappropriate touching" the next year, but the administrator did not report any of them to the police. *Id.* Instead, he "instruct[ed] the principal to closely monitor Willey, encourag[ed] parents not to say anything about the touching, and [told] Willey that if he sought psychiatric help, he would keep the allegations out of Willey's personnel file." *Id.* After Willey "transferred to ... the school district in which Child attended school," further complaints about Willey's conduct at his new school "were handled similarly to the previous complaints." *Id.*

¶ 5 "At both trials, [the attorneys] presented a memory confabulation defense, calling into question the reliability of Child's decade-old memory, specifically by alleging that a 'good,' encouraging touch by a teacher had been distorted in Child's memory over time into a 'bad,' sexual touch." *Id.* ¶ 6 (footnote omitted). This strategy "was formed through consultation with a memory expert [the attorneys] had used in several other cases. Before the first trial, [the attorneys] discussed with this expert the potential benefits and detriments of using a memory confabulation defense under the facts of this case." *Id.* ¶ 7. Because "the evidence that was available for the first trial ... [was] generally corroborative of Child's allegations," the attorneys and the expert agreed that it would be "difficult to argue that Child had confused a 'good' touch with a 'bad' touch, thus undermining [the attorneys'] defense theory that Child's memories were the result of memory confabulation." *Id.*

During their consultation, the memory expert further inquired whether there was a paper trail of any other independent or contemporaneous complaints made against Willey for inappropriate or sexual touching and opined that, if there were, such evidence would significantly undermine a memory confabulation defense. The memory expert also candidly explained that given the corroborating evidence available before the first trial, he could be compelled to testify under cross-examination by the State that the Child's memory of sexual abuse did not appear to be the result of contamination. [The attorneys were] further concerned that a memory expert's testimony would potentially open the door to admission of [testimony from witnesses who claimed to have seen Willey touch other students].

*Id.* The attorneys accordingly decided against "presenting a memory confabulation defense through an expert" because that approach "could end up bolstering the State's case." *Id.* Instead, they "elected to present such a defense by cross-examining the witnesses so as to highlight the discrepancies in or questionable circumstances surrounding their testimonies." *Id.*

¶ 6 The attorneys' strategic "decision not to have a memory expert testify at trial was further reinforced by the additional evidence that came to light between the first and second trials." *Id.* ¶ 8. In particular, "the school administrator's notes amounted to a paper trail of independent, contemporaneous corroboration of inappropriate touching" that the attorneys "recognized ... [w]as 'exactly the type of information that [the expert] said would sink the ship.'" *Id.* Although the administrator's notes, testimony from prior classmates, and testimony from other witnesses who might be called "did not specifically corroborate" all of Child's allegations, the attorneys "believed that this evidence did tend to show that Willey had touched Child or other children inappropriately, thus undermining a memory confabulation defense that Child had in his mind turned a 'good' touch into a 'bad' touch." *Id.* Consequently, the attorneys decided to rely on "the same strategy at the second trial that [they] had employed at the first trial: challenge the witnesses' credibility through cross-examina-

tion rather than relying on a memory expert whose testimony could potentially be used to bolster the State's case." *Id.*

¶ 7 Between the two trials, Willey and the State also entered into plea negotiations. Before the second trial began, the State offered to dismiss all of the charged first degree felony counts and forgo prosecution for any potential criminal behavior that occurred at his prior school district in exchange for Willey's *Alford* pleas[4] to two misdemeanor counts of lewdness involving a child. The parties offer disparate accounts of their subsequent discussions. The attorneys maintain that Bugden promptly contacted Willey by phone and advised him that the State had offered an advantageous plea bargain but that Willey rebuffed the offer, explaining that he could not imagine accepting even a favorable guilty plea in light of his innocence and the negative response of his family to any plea that required Willey's acknowledgement that he was guilty of sexual misconduct. The attorneys asserted that they then sent Willey a detailed letter analyzing the State's offer in light of the evidence that would likely be presented at Willey's next trial. To support their account, the attorneys provided the district court with a copy of the letter, a Federal Express receipt showing a delivery to Willey's address, delivery charges to Bugden's business credit card, and three affidavits attesting to the underlying facts. Bugden stated in his affidavit that after sending the letter, he and Isaacson "exhaustively discussed with Mr. Willey the evidence against him" and the State's latest plea agreement. The attorneys also pointed out that Willey admitted in a psychosexual evaluation before sentencing that he "recalled having some plea agreements but declined them because '[a]t the time [he] knew [he] was innocent and thought it would come out at trial.'"

¶ 8 By contrast, Willey asserts that he never received any written communication from the attorneys regarding a plea offer, and he denies receiving any information about the damaging evidence the State uncovered after the first trial that could have substantially influenced his decision about going forward. He does acknowledge that Bugden notified him of one plea offer by phone, but Willey maintains that Bugden's only advice was that "he wouldn't think less of [Willey] if [he] accepted the plea deal." In support, Willey offers his own affidavit.

¶ 9 At his second trial, Willey was convicted of seven counts of aggravated sexual abuse of a child, a first degree felony, *see* Utah Code Ann. § 76–5–404.1(4), (5) (LexisNexis Supp.2013), and the court imposed concurrent prison sentences of one to fifteen years for each count. Willey appealed, arguing that the attorneys provided ineffective assistance of counsel by failing to call a memory expert at trial, and we remanded under rule 23B of the Utah Rules of Appellate Procedure for an evidentiary hearing on that issue. After the district court found that there were "no facts to support an ineffective assistance of counsel claim," we affirmed, holding that Willey had "failed to adequately marshal the evidence to challenge the district court's findings of fact." *State v. Willey*, 2011 UT App 23, ¶ 12, 248 P.3d 1014. We also noted that "regardless of Willey's failure to marshal the evidence," the attorneys' "decision not to have a memory expert testify at trial fell well within the bounds of sound trial strategy." *Id.* ¶ 18.

¶ 10 In November 2010, Willey sued the attorneys for malpractice. He alleged that they were negligent for not calling a memory expert at trial and for failing to adequately communicate the State's plea offers before Willey's second trial. The attorneys filed a motion for summary judgment, arguing that Willey's malpractice claims either were barred by collateral estoppel or failed for lack of causation.[5] The attorneys' statement

---

4. "By entering an *Alford* plea, a defendant does not admit guilt. Rather, the defendant enters a guilty plea because he recognizes that a prosecutor has enough evidence to obtain a guilty verdict." *State v. Ott*, 2010 UT 1, ¶ 9 n. 2, 247 P.3d 344; *see also North Carolina v. Alford*, 400 U.S. 25, 37–38, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

5. The attorneys argued in their memorandum in support of summary judgment that Willey's claim failed on proximate cause grounds because, after failing to obtain post conviction relief, he could not show his injury resulted from his attorneys' error rather than his own underlying criminality. Some states require a criminal defendant to obtain post conviction relief, prove

of undisputed material facts sets out the district court's findings in the rule 23B evidentiary hearing, our decision affirming Willey's conviction, and the Utah Supreme Court's subsequent denial of Willey's petition for a writ of certiorari. In response, Willey did not deny any of the material facts from the attorneys' motion; instead, he set forth his own statement of material facts that essentially restated the allegations from his complaint.

¶ 11 The district court granted summary judgment in favor of the attorneys, holding that Willey's unsuccessful ineffective assistance claim precluded any malpractice claims related to the attorneys' failure to call a memory expert. After considering supplemental briefing on Willey's remaining claim that the attorneys had failed to adequately communicate settlement offers, the district court granted summary judgment on that issue as well. In its order, the court discussed the strong evidentiary support the attorneys provided to show that Willey received a letter detailing the State's last plea offer and that Willey himself acknowledged being aware of more than one plea offer. Willey appeals.

## ISSUES AND STANDARD OF REVIEW

■ ¶ 12 Willey argues that the district court committed several errors when it granted the attorneys' motion for summary judgment. First, the court should not have determined that Willey admitted the facts set forth in the attorneys' motion when he did not expressly deny them, and in any case, those facts "were not relevant or material" to Willey's claims. Second, the court "inappropriately glossed over the distinction" between legal malpractice and ineffective assistance of counsel and incorrectly held that an unsuc-

cessful ineffective assistance claim precludes a later claim for legal malpractice on the same issues. Finally, there were genuine issues of material fact about whether the attorneys adequately communicated and advised Willey regarding the State's plea offers, and the court inappropriately weighed this evidence. Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Utah R. Civ. P. 56(c). "We review a district court's grant of summary judgment for correctness." *Torian v. Craig*, 2012 UT 63, ¶ 13, 289 P.3d 479.

## ANALYSIS

¶ 13 We affirm the district court's summary judgment ruling on Willey's memory expert malpractice claims because Willey has failed to demonstrate that an unsuccessful claim of ineffective assistance of counsel in an underlying criminal case cannot have preclusive effects on subsequent claims for legal malpractice.[6] However, we agree with Willey that the district court weighed the evidence on his failure to communicate claim and inappropriately granted summary judgment on that issue.

### I. Issue Preclusion

¶ 14 Whether an ineffective assistance of counsel claim has preclusive effects on a subsequent claim for legal malpractice is an issue of first impression in Utah. But because Willey has inadequately briefed the issue, we are not in a position to resolve it and accordingly affirm the district court's ruling. *See* Utah R.App. P. 24(a)(9) ("The argument [of an appellate brief] shall contain the contentions and reasons of the appellant with respect to the issues presented. . . .").

---

actual innocence, or both, before maintaining a legal malpractice action against the former criminal defense attorney. *See, e.g., Wiley v. County of San Diego*, 19 Cal.4th 532, 79 Cal.Rptr.2d 672, 966 P.2d 983, 985 (1998) (requiring proof of actual innocence and citing decisions from nine jurisdictions that adopted the same rule); *Canaan v. Bartee*, 276 Kan. 116, 72 P.3d 911, 915–16, 918 (2003) (citing decisions from states that require proof of actual innocence and states that do not). For an exhaustive state survey of case law on the topic, see 3 Ronald E. Mallen &

Jeffrey M. Smith, *Legal Malpractice* § 27:13 (2013). The attorneys do not raise this issue on appeal.

**6.** Because our issue preclusion analysis disposes of Willey's memory expert malpractice claims, we need not reach the issue raised by the attorneys of whether Willey admitted the facts in the attorneys' motion for summary judgment by not expressly denying them.

¶ 15 "Collateral estoppel, otherwise known as issue preclusion, prevents parties or their privies from relitigating *facts and issues* in the second suit that were fully litigated in the first suit." *Moss v. Parr Waddoups Brown Gee & Loveless,* 2012 UT 42, ¶ 23, 285 P.3d 1157 (citation and internal quotation marks omitted). " 'In effect, once a party has had his or her day in court and lost, he or she does not get a second chance to prevail on the same issues.' " *State v. Baker,* 2008 UT App 8, ¶ 2, 176 P.3d 493 (quoting *Buckner v. Kennard,* 2004 UT 78, ¶ 12, 99 P.3d 842). Issue preclusion has four conjunctive elements:

(i) the party against whom issue preclusion is asserted [was] a party to or in privity with a party to the prior adjudication; (ii) the issue decided in the prior adjudication [was] identical to the one presented in the instant action; (iii) the issue in the first action [was] completely, fully, and fairly litigated; and (iv) the first suit ... resulted in a final judgment on the merits.

*Jensen ex rel. Jensen v. Cunningham,* 2011 UT 17, ¶ 41, 250 P.3d 465 (alterations and omission in original) (citation and internal quotation marks omitted). Issue preclusion applies in both civil and criminal proceedings. *State v. Cahoon,* 2009 UT 9, ¶ 15, 203 P.3d 957.

¶ 16 There is no dispute that Willey was a party to the ineffective assistance case and that there was a final judgment on the merits. But he argues that the issues of ineffective assistance of counsel in that case are not identical to the issues of attorney malpractice in this civil case and that he therefore did not have a full and fair opportunity to litigate his trial counsel's negligence in the criminal proceeding.

¶ 17 To prevail on an ineffective assistance of counsel claim, a " 'defendant must show that counsel's performance was deficient' " and " 'that the deficient performance prejudiced the defense.' " *State v. Templin,* 805 P.2d 182, 186 (Utah 1990) (quoting *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). A legal malpractice plaintiff confronts a similar challenge in proving that his

or her attorney's representation fell below an objective standard of care, *Watkiss & Saperstein v. Williams,* 931 P.2d 840, 846 (Utah 1996), and that "absent the attorney's negligence, the underlying suit would have been successful," *Harline v. Barker,* 912 P.2d 433, 439 (Utah 1996). Neither the district court's findings at the 23B hearing nor our ultimate decision on Willey's ineffective assistance claim addressed the second element of ineffective assistance, prejudice. The question before us, then, is whether the standard of deficient performance in an ineffective assistance case is similar enough to the standard of care in a legal malpractice case to satisfy the second element of issue preclusion.

¶ 18 The verbal formulations Utah courts use to describe the standard of care in legal malpractice cases and the deficient performance prong of ineffective assistance appear facially distinct. In the context of legal malpractice, courts describe an attorney's duty as requiring the "use [of] such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake." *Williams,* 931 P.2d at 846 (citation and internal quotation marks omitted). Like civil negligence actions generally, the plaintiff has the burden to prove a breach of that duty by a preponderance of the evidence. *See Lund v. Phillips Petroleum Co.,* 10 Utah 2d 276, 351 P.2d 952, 954 (1960) (describing the burden of proof for negligence claims). In ineffective assistance cases, "the proper measure of attorney performance" is the apparently comparable standard of "reasonableness under prevailing professional norms." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. Stated another way, a defendant must "demonstrate that counsel's performance was deficient, in that it fell below an objective standard of reasonable professional judgment." *State v. Litherland,* 2000 UT 76, ¶ 19, 12 P.3d 92 (citing *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052). The defendant has the burden of proof in ineffective assistance cases but must also "rebut the strong presumption that under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (citation and internal quotation marks omitted).

And some commentators have argued that the "strong" presumption of competent representation in ineffective assistance cases makes a finding of deficient performance qualitatively different from a determination of negligent representation in a civil suit.[7]

¶ 19 Nevertheless, while no Utah court has directly addressed the issue, other jurisdictions have held that there is no significant difference between the two standards for purposes of issue preclusion. For example, in *McCord v. Bailey*, 636 F.2d 606 (D.C.Cir. 1980), the D.C. Circuit held that a prior unsuccessful ineffective assistance claim precluded a subsequent claim for legal malpractice, emphasizing that "the legal standards for ineffective assistance of counsel ... and for legal malpractice ... are equivalent." *Id.* at 609. The claims in both the civil case and the underlying criminal case in *McCord* hinged on the attorney's alleged disloyalty and ineffective cross-examination of key witnesses. *Id.* at 608–09. The court concluded that because the facts and issues were the same in both cases, the issues were actually litigated in the criminal proceeding, and the plaintiff had "every incentive in his criminal proceedings to argue aggressively for his claim." *Id.* at 610–11.

¶ 20 Similarly, in *Zeidwig v. Ward*, 548 So.2d 209 (Fla.1989), the Florida Supreme Court held that after a defendant loses an ineffective assistance claim, "the defendant/attorney in a subsequent civil malpractice action brought by the criminal defendant may defensively assert collateral estoppel." *Id.* at 214. The court reasoned that failing "to allow the use of collateral estoppel in these circumstances is neither logical nor reasonable" because " '[i]t would undermine the effective administration of the judicial system to ignore completely a prior decision of a court ... on the same issue.' " *Id.* (quoting *Johnson v. Raban*, 702 S.W.2d 134, 138 (Mo.Ct.App.1985)). Other courts have held that a defendant who loses an ineffective assistance claim in a federal habeas proceeding cannot later assert a legal malpractice claim involving the same issues in state court. *See, e.g., Younan v. Caruso*, 51 Cal. App.4th 401, 59 Cal.Rptr.2d 103, 107 (1996) ("[T]he habeas standard for gauging the effectiveness of trial counsel is the same as in a legal malpractice action...."); *Belford v. McHale Cook & Welch*, 648 N.E.2d 1241, 1246 (Ind.Ct.App.1995) ("The first step of the *Strickland* standard and the breach element of legal malpractice are identical, *i.e.*, counsel must act reasonably.").

¶ 21 Willey provides us with no basis for rejecting the reasoning of these cases, which appears to have been followed in virtually every jurisdiction that has considered the issue: our own research indicates that courts in Alaska, California, Connecticut, Colorado, Delaware, Georgia, Illinois, Indiana, Maine, Michigan, Missouri, New York, Ohio, Pennsylvania, Tennessee, and Texas all hold that collateral estoppel applies in this context.[8] Willey has not cited any

---

7. For further discussion of the conceptual difficulties involved in equating the deficient performance prong of ineffective assistance with breach of duty in a legal malpractice claim, see Meredith J. Duncan, *Criminal Malpractice: A Lawyer's Holiday*, 37 Ga. L.Rev. 1251, 1272–73 (2003); Meredith J. Duncan, *The (So–Called) Liability of Criminal Defense Attorneys: A System in Need of Reform*, 2002 BYU L.Rev. 1, 34–37; Susan P. Koniak, *Through the Looking Glass of Ethics and the Wrong with Rights We Find There*, 9 Geo. J. Legal Ethics 1, 6–9 (1995). For a contrary view, see Susan M. Treyz, *Criminal Malpractice: Privilege of the Innocent Plaintiff?*, 59 Fordham L.Rev. 719, 724–26 (1991).

8. *Shaw v. State*, 816 P.2d 1358, 1361 (Alaska 1991) ("If the defendant was denied post-conviction relief, the legal principle of collateral estoppel would serve to eliminate any malpractice claim."); *Younan v. Caruso*, 51 Cal.App.4th 401,

59 Cal.Rptr.2d 103, 107 (1996) ("[T]he habeas standard for gauging the effectiveness of trial counsel is the same as in a legal malpractice action...."); *Rantz v. Kaufman*, 109 P.3d 132, 140 (Colo.2005) (holding that "the inquiry undertaken" in ineffective assistance cases and legal malpractice cases "is identical and focuses on what ordinary members of the legal profession would have done at the time the action was taken"); *Gray v. Weinstein*, No. X02CV010175974S, 2004 WL 3130552, at *5–6 (Conn.Super.Ct. Dec. 22, 2004) (holding that the issues of deficient performance in habeas cases asserting ineffective assistance and negligent representation in legal malpractice cases "are functionally identical"), *aff'd*, 110 Conn.App. 763, 955 A.2d 1246 (2008); *Sanders v. Malik*, 711 A.2d 32, 34 (Del.1998) (holding that the denial of an ineffective assistance claim collaterally estopped a malpractice claim); *Cornwell v. Kirwan*, 270 Ga.App. 147, 606 S.E.2d 1, 4–5 (2004) (im-

cases that hold otherwise, and our survey of other state court decisions, while not exhaustive, has failed to uncover any case that supports his position. Rather, Willey's brief fails to acknowledge any precedent adverse to his position but simply asserts in conclusory fashion that "the elements of ineffective assistance of counsel are not the same as the elements of legal malpractice" and cites a student note in the Ohio State Journal of Criminal Law that devotes only a few paragraphs to a secondhand discussion of the topic.[9] "[B]ald citations to authority" without meaningful analysis, however, do not articulate Willey's claim "with sufficient specificity for this court to make a ruling on the merits." *See Allen v. Friel*, 2008 UT 56, ¶ 9, 194 P.3d 903 (citation and internal quotation marks omitted); *see also* Utah R.App. P. 24(a)(9) ("The argument [of an appellate brief] shall contain the contentions and reasons of the appellant with respect to the issues presented...."). Without more, we are not in a position to rule at this point on the legal issue, much less to establish a rule that departs from what appears to be uniform precedent in other jurisdictions. We

accordingly decline to revisit the district court's grant of summary judgment on Willey's memory expert malpractice claims.

## II. Failure To Communicate the Misdemeanor Plea Offer

¶ 22 Willey also challenges the district court's award of summary judgment to the attorneys on his failure to communicate claim, which was not litigated in the criminal proceeding and therefore raises no issue preclusion question. He argues that there were material facts in dispute and that the district court improperly "engage[d] in the weighing of evidence."

¶ 23 This claim requires Willey to show, among other things, that the attorneys breached a duty arising out of their attorney-client relationship, and that Willey would have benefited if the attorneys "had adhered to ordinary standards of professional competence." *See Christensen & Jensen, PC v. Barrett & Daines*, 2008 UT 64, ¶¶ 22, 26, 194 P.3d 931 (citation and internal quotation marks omitted). Because "the negotiation of

posing sanctions on an attorney and his client jointly for filing a malpractice claim because his client's habeas petition that raised the same issues in an ineffective assistance claim had been denied); *Griffin v. Goldenhersh*, 323 Ill.App.3d 398, 257 Ill.Dec. 52, 752 N.E.2d 1232, 1239 (2001) ("The elements of a legal malpractice action and the elements of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) are the same for the purposes of collateral estoppel."); *Belford v. McHale Cook & Welch*, 648 N.E.2d 1241, 1246 (Ind.Ct.App.1995) ("The first step of the *Strickland* standard and the breach element of legal malpractice are identical, *i.e.*, counsel must act reasonably."); *Brewer v. Hagemann*, 2001 ME 27, ¶¶ 8–9, 771 A.2d 1030, 1033 (holding that collateral estoppel barred a legal malpractice claim where the plaintiff had previously lost an ineffective assistance claim); *Knoblauch v. Kenyon*, 163 Mich.App. 712, 415 N.W.2d 286, 289 (1987) ("We therefore hold that the legal standards for ineffective assistance of counsel ... and for legal malpractice ... are equivalent for purposes of ... collateral estoppel."); *Johnson v. Raban*, 702 S.W.2d 134, 138 (Mo.Ct.App.1985) ("The collateral estoppel effect of the [denial of an ineffective assistance claim] ... therefore precludes plaintiff from relitigating the issue of defendant's negligence."); *Krahn v. Kinney*, 43 Ohio St.3d 103, 538 N.E.2d 1058, 1062–63 (1989) (noting that the denial of an

ineffective assistance claim can have preclusive effects on a malpractice claim, but concluding that the particular plaintiff's malpractice claim hinged on an issue unrelated to those litigated in the ineffective assistance case); *Alberici v. Tinari*, 374 Pa.Super. 20, 542 A.2d 127, 132 (1988) (holding that because the "appellant ha[d] unsuccessfully raised the question of ineffectiveness of counsel at three levels in the federal judicial system, ... [t]he second element of [legal malpractice, failure to exercise knowledge and skill,] ha[d] not been met"); *Gibson v. Trant*, 58 S.W.3d 103, 115 (Tenn.2001) ("[C]riminal defendants who seek to overturn their convictions, as they have every incentive to do, may not relitigate their claims in a malpractice suit."); *Garcia v. Ray*, 556 S.W.2d 870, 872 (Tex.Civ.App.1977) (stating that an adverse ruling on an ineffective assistance claim barred the criminal defendant's assertion of a civil legal malpractice claim). *Cf. Vavolizza v. Krieger*, 33 N.Y.2d 351, 352 N.Y.S.2d 919, 308 N.E.2d 439, 441–42 (1974) (holding that denial of a criminal defendant's motion to vacate a guilty plea in a criminal action acted to collaterally estop a later civil action for malpractice based on his attorney's advice to plead guilty).

9. Willey cites Kevin Bennardo, Note, *A Defense Bar: The "Proof of Innocence" Requirement in Criminal Malpractice Claims*, 5 Ohio St. J.Crim. L. 341, 345–46 (2007).

a plea bargain is a critical phase of litigation," *Missouri v. Frye,* —— U.S. ——, 132 S.Ct. 1399, 1406, 182 L.Ed.2d 379 (2012) (citation and internal quotation marks omitted), "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused," *id.* at 1408. "For example, a lawyer who receives from opposing counsel ... a proffered plea bargain in a criminal case must promptly inform the client of its substance unless the client has previously indicated that the proposal will be ... unacceptable or has authorized the lawyer to accept or reject the offer." Utah R. Prof'l Conduct 1.4 cmt. 2; *see also id.* R. 1.2(a) ("In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered....").[10] An attorney who fails to communicate a plea offer to his client can therefore be liable for malpractice if the lack of communication damages the client. *See Huffer v. Cicero,* 107 Ohio App.3d 65, 667 N.E.2d 1031, 1033–34, 1037 (1995) (holding that a plaintiff in a legal malpractice action could recover attorney fees, together with the difference between a fine imposed on him and a lower fine offered in a plea bargain that his attorney never disclosed).

¶ 24 The attorneys assert that they communicated multiple plea offers to Willey and that they thoroughly explained the State's misdemeanor *Alford* plea offer over the phone, by mail, and in a face-to-face meeting before trial. Despite their efforts, the attorneys claim, Willey "was adamant ... that he was unwilling to consider any plea offer because he was innocent." In support of these assertions, the attorneys offered Bugden's affidavit, Isaacson's affidavit, an affidavit from the legal assistant who prepared the letter communicating the offer to Willey, a Federal Express receipt showing a delivery to Willey's address just after the letter's date, and charges to Bugden's business credit card for that delivery. The attorneys also pointed the district court to Willey's presentence psychosexual evaluation where Willey stated that he "recalled having some plea agreements but declined them because '[a]t the time [he] knew [he] was innocent and thought it would come out at trial.'" This evidence, the attorneys argue, shows that "[i]t is undisputed that Mr. Willey was informed of plea negotiations" and that Willey would not have accepted a plea offer anyway "because he believed he was not guilty."

¶ 25 Willey, on the other hand, asserts that the attorneys not only failed to communicate to him multiple plea offers from the State, but also "never told" him "of the grave concerns [the attorneys] harbored about the evidence and theory of his case." Willey further denies receiving the detailed letter the attorneys claim to have sent by Federal Express just before trial that discussed damaging evidence the State had discovered between the two trials and an offer for Willey to "[p]lead 'no contest' on an *Alford* guilty plea to two [misdemeanor] counts of Lewdness Involving a Child." Willey also asserts that he never "refused to consider any plea offer." In support, Willey offered his own sworn statement in an affidavit.

¶ 26 We conclude that the district court inappropriately weighed this conflicting evidence. Summary judgment can be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). Where "reasonable jurors, properly instructed, would be able to come ... to different conclusions," there is an issue of fact and summary judgment is not appropriate. *Clegg v. Wasatch Cnty.,* 2010 UT 5, ¶ 15, 227 P.3d 1243. Courts are "not required to draw every possible inference of fact, no matter how remote or improbable, in favor of the nonmoving party," *IHC Health Servs., Inc. v. D & K Mgmt., Inc.,* 2008 UT 73, ¶ 19, 196 P.3d 588, but they

---

**10.** By citing the Utah Rules of Professional Conduct, we do not imply that a rule violation automatically gives rise to a malpractice action. Utah courts have consistently held that "[t]he Rules of Professional Conduct are not a basis for civil liability," even though an attorney's negligence "may well violate" a particular rule. *Kilpatrick v. Wiley, Rein & Fielding,* 909 P.2d 1283, 1291 n. 3 (Utah Ct.App.1996); *accord Archuleta v. Hughes,* 969 P.2d 409, 413–14 (Utah 1998).

must also avoid weighing the credibility of conflicting evidence, *Webster v. Sill*, 675 P.2d 1170, 1172 (Utah 1983). In this regard, the Utah Supreme Court has instructed that " 'it only takes one sworn statement under oath to dispute the averments on the other side of the controversy and create an issue of fact.' " *Draper City v. Estate of Bernardo*, 888 P.2d 1097, 1101 (Utah 1995) (quoting *Holbrook Co. v. Adams*, 542 P.2d 191, 193 (Utah 1975)).

¶ 27 Here, the attorneys provided strong evidence that they sent a letter explaining the misdemeanor plea offer and that they discussed the letter and damaging evidence with Willey before trial. But Willey's denials in a sworn statement create an issue of fact regarding whether Willey did in fact receive the letter and whether he ever had the opportunity to discuss its contents with the attorneys. Even if the evidence was undisputed as to the preparation and sending of the letter, Willey alleges in a sworn statement that the attorneys "never met with [him] to discuss plea negotiations, plea bargains, or plea offers" and that he did not receive a letter before trial discussing the State's misdemeanor plea offer. Willey also alleges that although he was aware "of a single plea offer," the attorneys' only advice regarding the offer was that they "wouldn't think less of [Willey] if [he] accepted the plea deal." Moreover, according to Willey, the attorneys "did not ... discuss the evidence against [him] prior to [his] re-trial," and he asserts that he never "refused to consider any plea offer." These allegations, if believed by a jury, could support a claim that the attorneys breached a duty to "use such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess," *see Watkiss & Saperstein v. Williams*, 931 P.2d 840, 846 (Utah 1996), in assuring that Willey had all the information he needed to intelligently assess the risks, benefits, and wisdom of proceeding to a second trial on several first degree felony charges instead of accepting the State's misdemeanor plea offer.

¶ 28 As the district court apparently did, a jury could consider Willey's explanation implausible in light of the evidence the attorneys presented, but "weighing credibility and assigning weight to conflicting evidence" is not appropriate at the summary judgment stage. *See Martin v. Lauder*, 2010 UT App 216, ¶ 14, 239 P.3d 519. And Willey's single " 'sworn statement under oath' " is enough " 'to dispute [the attorneys'] averments ... and create an issue of fact' " for trial. *See Estate of Bernardo*, 888 P.2d at 1101 (quoting *Holbrook*, 542 P.2d at 193). We therefore cannot agree with the district court that it was undisputed that Willey "knew about the plea offers and was advised regarding the plea offers by counsel in the May 31, 2007 letter ... [and] that [Willey] expressly confirmed that he decided not to accept the plea offers because he was not guilty and thought it would be wrong." Willey certainly made statements to that effect in his psychosexual evaluation and a presentence report, but neither statement precludes the possibility that Willey did not receive reasonably competent advice and may have accepted a plea if fully informed, something he swears did not occur.[11] Consequently, Willey's failure to communicate claim cannot be resolved as a matter of summary judgment.

## CONCLUSION

¶ 29 We affirm the district court's ruling on Willey's memory expert malpractice claims because Willey has not adequately briefed the issue on appeal. We also conclude that the district court improperly weighed conflicting evidence on Willey's failure to communicate claim and reverse and remand that claim for further proceedings consistent with this opinion.

---

11. In the presentence report, Willey stated, "I was offered a plea agreement by the prosecutor of two class A misdemeanor charges but refused to accept this, feeling why should I when I'm not guilty. Obviously, that was a mistake looking at what has happened, but my attorney didn't advise me differently. I still feel accepting the lower charge would have been wrong because I am not guilty." In his psychosexual evaluation before sentencing, Willey "recalled having some plea agreements but declined them because '[a]t the time [he] knew [he] was innocent and thought it would come out at trial.' "