*This opinion is subject to revision before final publication in the Pacific Reporter*

**2017 UT 5**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

NATALIE HESLOP and BRANDON HESLOP,
*Appellants,*

*v.*

BEAR RIVER MUTUAL INSURANCE COMPANY,
*Appellee.*

No. 20150697
Filed January 24, 2017

On Direct Appeal

Third District, Salt Lake
The Honorable William W. Barrett
No. 150900930

Attorneys:

Ronald E. Dalby, John P. Lowrance, Timothy E. Pettitt, South Jordan,
for appellants

Kristin A. Van Orman, Jeremy G. Knight, Salt Lake City, for appellee

JUSTICE PEARCE authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE DURHAM, and JUSTICE HIMONAS joined.

JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1 Natalie Heslop (Heslop) rolled her truck down an embankment. She told the responding police officer, her family, and medical personnel that the accident had been a suicide attempt. Ten days after the crash, she told an insurance adjuster that her "mind wasn't right," she had taken "too many pills" the day before the crash, and that the crash was "pretty much a suicide attempt." Her insurance policy provided that it would exclude coverage "to any injured person, if the person's conduct contributed to his injury . . . by intentionally causing injury to himself." The district court granted

summary judgment to Bear River Mutual Insurance Company (Bear River) as to both Natalie Heslop's personal injury claim and her husband Brandon Heslop's property damage claim. It also denied the Heslops' request for a continuance to permit additional discovery. We affirm.

## BACKGROUND

¶2 On Sunday, October 5, 2014, Heslop overdosed on prescription Ambien and Lexapro. The next day, she decided to drive through Ogden Canyon to "look at the leaves." While in the canyon, Heslop, unseatbelted, rolled her truck down an embankment. She suffered a hairline fracture to her C7 vertebrae. She received a skin graft and stitches over her right eye. She was also admitted to a hospital behavioral unit for several days.

¶3 On October 16, a Bear River insurance adjuster called Heslop to question her about the accident. Heslop told the adjuster that her crash in the canyon "was pretty much a suicide attempt." The adjuster asked, "you mean driving off the cliff was a, a suicide attempt?" She responded, "Yeah." The adjuster asked Heslop, "Okay, and then what, you just saw an edge there and decided, you know, this is it?" Again she responded, "Yeah." When the agent asked Heslop if she had admitted to anybody else that her crash was a suicide attempt, she told him, "my whole family knows . . . , I told the police and all the doctors knew."

¶4 When the adjuster asked Heslop why she had attempted suicide, she responded, "I had a bad reaction to a medication"; "I was going to the doctors all the time, everyone was just treating me for anxiety and the medications weren't fixing it"; and "without the medication being right my mind wasn't right and, and I, I don't know, I know it wasn't the right choice." She also told the insurance adjuster "I think it's due to my medications not being where they should have been."

¶5 Heslop expressed concern that admitting the crash was a suicide attempt would impact her coverage. Her insurance policy's property damage provision covers only "accidental loss of or damage to [a] covered car." And the policy's intentional injury exclusion provision "does not apply . . . to any injured person, if the

2

person's conduct contributed to his injury . . . by intentionally causing injury to himself."[1]

¶6 The Heslops attempted to collect from Bear River under both a personal injury protection (PIP) claim for Heslop's personal injuries and a property damage claim for damage to the truck. But ten days after Heslop's interview with the insurance adjuster, the Heslops received a letter from Bear River denying their claims. Bear River based its denial on Heslop's admission that she intended to drive down the embankment. It explained that because Heslop "admitted to us that she was trying to use the vehicle to intentionally take her life by driving off the cliff, we cannot see how this can be considered 'accidental' loss."

¶7 The Heslops asked Bear River to reconsider its decision. In support of their request, the Heslops forwarded a letter from Heslop's psychiatrist, Dr. Ben Holt. Dr. Holt had begun treating Heslop after the incident. Dr. Holt explained that the day before the crash, Heslop had "overdosed on a large amount of Ambien and Lexapro in a suicide attempt." Dr. Holt stated that as a result of ingesting the drugs, Heslop had developed "serotonin syndrome," which can induce "agitated delirium" and "disorientation," among other things. Dr. Holt explained that "[s]ome of the irrational behavior [Heslop] experienced, including driving her car off the road[,] could be contributed [sic] to the serotonin syndrome and possible agitated delirium and disorientation she experienced after the overdose the day prior to the incident."

¶8 In February 2015, the Heslops filed a complaint against Bear River alleging breach of contract, breach of the covenant of good faith and fair dealing, statutory relief, and intentional infliction of emotional distress. In April, Bear River moved for summary judgment. It argued that both Utah Code section 31A-22-309 and the terms of the insurance policy barred the Heslops' claim. Bear River contended that the Heslops could not be compensated for property damage because the "crash was not accidental in nature, but the

---

[1] This intentional injury exclusion provision mirrors the language of Utah Code section 31A-22-309(2)(a)(iii), which allows for exclusion of personal injury protection coverage benefits "to any injured person, if the person's conduct contributed to his injury . . . by intentionally causing injury to himself."

result of Ms. Heslop's intentional effort to crash her vehicle." It reasoned that Dr. Holt's letter averring that Heslop's serotonin syndrome "*could* contribute to 'irrational acts,' . . . did not opine that it *did* contribute to her act, or more importantly, that [it] negated her intent." Bear River argued, "there is no dispute that Ms. Heslop contributed to her injuries when she intentionally drove her vehicle off the Ogden Canyon roadway in a suicide attempt."

¶9 The Heslops opposed Bear River's motion for summary judgment. They contended that "[t]here is a genuine issue of material fact as to whether [Heslop] had the mental capacity to perform an intentional act." The Heslops cited *Hoffman v. Life Insurance Company of North America* for the proposition that "mental disease or defect of the insured is a relevant consideration in determining whether an insured's [injury] is accidental." 669 P.2d 410, 419 (Utah 1983). They further cited *Hoffman* for the proposition that

> where the insured suffers from a mental disease or defect so that he is not likely to be able to appreciate the consequences of his conduct, or cannot control his conduct in light of the probable consequences, then the test is subjective, and [injury] may be accidental even though a rational person in the same circumstances would have expected [injury] to be the probable result of his conduct.

*Id.*

¶10 The Heslops also offered a letter from Dr. Michael Crookston. Dr. Crookston's letter spoke to the likely effects of Ambien on Heslop the day of the crash. He did not interview Heslop, but he reviewed Dr. Holt's letter. Dr. Crookston averred that

> [s]ince Ms. Heslop took an overdose of Ambien, any and all statements she may have made concerning subsequent events, including the next day, are immediately suspect and unreliable. Under the influence of an Ambien overdose it is highly likely that Ms. Heslop was impaired cognitively and therefore could not fully appreciate the consequences of her actions or have the ability to fully control her actions.

¶11 At the end of their memorandum, the Heslops asked the court for a continuance. The Heslops requested—citing Utah Rule of

Civil Procedure 56(f)[2]—additional time to permit "further discovery" into Heslop's "mental state, capacity, the effects of serotonin syndrome, or the effects of large amounts of Ambien and Lexapro to the human system." In support of this request, the Heslops included a sworn affidavit of their attorney. The attorney stated that he believed "additional discovery is required prior to this matter being able to be fully adjudicated on the merits." He opined that he also believed both Dr. Holt and Dr. Crookston "would testify under oath as to the veracity of the information and opinions currently contained in their letters."

¶12 The district court granted Bear River's motion for summary judgment. It stated that Heslop's PIP coverage was governed by the Utah statute and the insurance policy's intentional injury exclusion provision. The court noted a Michigan case in which the insured had intentionally crashed his car in a suicide attempt and had introduced an affidavit from a medical professional stating that he was severely depressed, coming off prescription drugs, and lacked the mental capacity to form the intent to commit suicide. *Miller v. Farm Bureau Mut. Ins. Co.*, 553 N.W.2d 371, 377 (Mich. Ct. App. 1996). The *Miller* court held that the "intentional acts" clause in the policy prevented the insured from collecting under the policy. *Id.* The district court adopted the Michigan case's reasoning that "when the evidence unequivocally shows that the insured intended his or her actions, the existence of mental illness does not alter that conclusion." *Id.*

¶13 The district court further reasoned that "Dr. Holt's [letter] did not opine that the Serotonin Syndrome contribute[d] to Mrs. Heslop's act, or that Serotonin Syndrome negated her intent." It further noted that Dr. Crookston's letter did not opine "that [Heslop] was 'sleep driving' at the time she drove off the road, or that she cannot remember what she did." In the end, the court found that the doctors' equivocal statements regarding Heslop's mental status did not sufficiently rebut "the undisputed facts [that] unequivocally show that [Heslop] intended to drive off the road in a suicide attempt."

---

[2] In 2015, rule 56(f) became rule 56(d). *See* UTAH R. CIV. P. 56 (2015). We, thus, refer to the 2014 Utah Rules of Civil Procedure—which govern this case—and keep the reference to rule 56(f).

¶14 The district court concluded, "There is no dispute that Mrs. Heslop expected to be injured when she drove off the Ogden Canyon road or that she intended to kill herself. Accordingly, the intentional acts exclusion of the Policy and Utah Code . . . apply in this case." It further concluded that "Brandon Heslop's first-party cause of action against [Bear River] also fails as a matter of law due to the intentional acts exclusion," because "he is part owner and a named insured of the vehicle, not a third-party victim in this accident" and because Utah law "does not require that Defendant insure itself against loss imposed by the law for damages caused by its named insured." "Rather," the court stated, "liability falls upon [Heslop], who is also a named insured and the one who caused the damage."

## ISSUES AND STANDARDS OF REVIEW

¶15 The Heslops contend that the district court erred when it granted summary judgment both "on the issue of Personal Injury Protection (PIP) coverage" and "on the issue of property damage." We review a grant of summary judgment for correctness. *Helf v. Chevron U.S.A. Inc.*, 2015 UT 81, ¶ 46, 361 P.3d 63. We give no deference to the district court's legal conclusions and consider whether the court correctly decided "that no genuine issue of material fact existed." *Id.* We "review the facts in a light most favorable to the party against whom summary judgment was granted." *Larson v. Wycoff Co.*, 624 P.2d 1151, 1153 (Utah 1981).

¶16 The Heslops also contend that the district court abused its discretion when it denied their rule 56(f) motion for a continuance. *See* UTAH R. CIV. P. 56(f) (2014). We review a district court's grant or denial of a rule 56(f) motion for abuse of discretion. *Crossland Sav. v. Hatch*, 877 P.2d 1241, 1243 (Utah 1994). "[W]e will not reverse unless the [court's] decision exceeds the limits of reasonability." *Id.*

## ANALYSIS

I. The District Court Appropriately Granted Summary Judgment to Bear River on the Personal Injury Protection Claim

¶17 The Heslops contend that "the district court erred in granting Bear River's motion for summary judgment on the issue of PIP coverage" because there is a genuine issue of material fact concerning Heslop's ability "to form intent at the time of her injuries." The Heslops argue that both Heslop's interview and the doctors' letters raise a factual question as to Heslop's ability to form

intent. They also contend that the district court erred by adopting the Michigan court's reasoning that the existence of mental illness does not prevent a court from concluding that an insured's actions are intentional.

¶18 The district court found that the intentional injury exclusion provision in Heslop's policy defeated her PIP claim because Heslop admitted she intentionally drove her car off the road. The court noted that, "in determining whether an injury was accidental or intentional, the Utah Supreme Court has focused on whether the result was intended or expected." (Citing *N.M. ex rel Caleb v. Daniel E.*, 2008 UT 1, ¶ 11, 175 P.3d 566 (citing *Hoffman v. Life Ins. Co. of N. Am.*, 669 P.2d 410, 416 (Utah 1983))). But the district court also applied the *Miller* test from Michigan, explaining that "when the evidence unequivocally shows that the insured intended his or her actions, the existence of mental illness does not alter that conclusion." *Miller v. Farm Bureau Mut. Ins. Co.*, 553 N.W.2d 371, 377 (Mich. Ct. App. 1996).

¶19 In finding that there was no genuine issue of material fact as to Heslop's intent, the court reasoned that Dr. Holt "did not opine that the Serotonin Syndrome contribute[d] to [Heslop's] act, or that [it] negated her intent." It further reasoned that Dr. Crookston's letter on the effects of Ambien did not opine that Heslop was "'sleep driving' at the time she drove off the road, or that she [could not] remember what she did." The district court thus concluded that

> [t]he undisputed facts in this case demonstrate that [Heslop's] *intent* was to commit suicide, regardless of Serotonin Syndrome, prior medication usage, or knowing such was a "wrong choice." There is no dispute that [Heslop] expected to be injured when she drove off the Ogden Canyon Road or that she intended to kill herself.

¶20 "We review [a] district court's summary judgment ruling for correctness, granting no deference to its legal conclusions, and consider whether it correctly concluded that no genuine issue of material fact existed." *Helf v. Chevron U.S.A. Inc.*, 2015 UT 81, ¶ 46, 361 P.3d 63 (alteration in original). In determining whether a factual dispute exists, we apply "an objective standard." *Clegg v. Wasatch Cty.*, 2010 UT 5, ¶ 15, 227 P.3d 1243. The objective standard asks "whether reasonable jurors, properly instructed, would be able to come to only one conclusion, or if they might come to different

conclusions, thereby making summary judgment inappropriate." *Id.* But "where there could be no reasonable difference of opinion on [a question of fact] in light of the available evidence, 'the decision is one of law for the trial judge or for an appellate court.'" *AMS Salt Indus., Inc. v. Magnesium Corp. of Am.*, 942 P.2d 315, 320 (Utah 1997) (citation omitted).

¶21 In the summary judgment context, "[t]he word 'genuine' indicates that a district court is not required to draw every possible inference of fact, no matter how remote or improbable, in favor of the nonmoving party." *IHC Health Servs., Inc. v. D & K Mgmt., Inc.*, 2008 UT 73, ¶ 19, 196 P.3d 588. "Instead, it is required to draw all *reasonable* inferences in favor of the nonmoving party." *Id.* (emphasis in original). And although circumstantial evidence may sometimes raise an inference strong enough to create a genuine issue of material fact on summary judgment, to be reasonable, the inference must present something more than pure speculation. *See USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 137, 372 P.3d 629; *State v. Hester*, 2000 UT App 159, ¶ 16, 3 P.3d 725 (noting the difference between drawing a reasonable inference and "merely speculating about possibilities").

¶22 In distinguishing between a reasonable inference and speculation, an "inference is a deduction as to the existence of a fact which human experience teaches us can reasonably and logically be drawn from proof of other facts." *Manchester v. Dugan*, 247 A.2d 827, 829 (Me. 1968). Speculation, on the other hand, is the "act or practice of theorizing about matters over which there is no certain knowledge." *Speculation*, BLACK'S LAW DICTIONARY (10th ed. 2014). Of course, "there is no black line between inference and speculation." *Hester*, 2000 UT App 159, ¶ 17. But a reasonable inference exists when "there is at least a foundation in the evidence upon which the ultimate conclusion is based," while "in the case of speculation, there is no underlying evidence to support the conclusion." *Harding v. Atlas Title Ins. Agency, Inc.*, 2012 UT App 236, ¶ 7, 285 P.3d 1260.

¶23 "A single sworn statement is sufficient to create an issue of fact." *Webster v. Sill*, 675 P.2d 1170, 1172 (Utah 1983). But

> an affidavit must do more than reflect the affiant's opinions and conclusions. The affidavit must 'set forth specific facts' showing there is a genuine issue for trial. The mere assertion that an issue of fact exists without a proper evidentiary foundation to support that assertion

is insufficient to preclude the granting of a summary judgment motion.

*Id.* (citations omitted).

¶24  In sum, we will "affirm a grant of summary judgment only if there are no disputed issues of material fact and, with the facts and all reasonable inferences viewed in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law." *Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶ 36, 250 P.3d 465.

*A. A district court may consider an insured's mental disease or defect when determining whether injuries are accidental or intentional*

¶25  The district court correctly noted that "in determining whether an injury was accidental or intentional, the Utah Supreme Court has focused on whether the result was intended or expected." Relying on *Miller*, the district court also concluded that, "when the evidence unequivocally shows that the insured intended his or her actions, the existence of mental illness does not alter that conclusion." *Miller v. Farm Bureau Mut. Ins. Co.*, 553 N.W.2d 371, 377 (Mich. Ct. App. 1996). The Heslops contend that the *Miller* test stands "in direct opposition to Utah Law."

¶26  Although "direct opposition" overstates the point, we generally agree with the Heslops that *Miller's* standard does not accurately reflect the way Utah courts have approached the question. Instead, we recognize that the effects of mental illness can impact the ability of an insured to intend her actions. In *Hoffman v. Life Insurance Company of North America*, we stated that in Utah, "[t]he law is firmly established that the mental disease or defect of the insured is a relevant consideration in determining whether an insured's death is accidental." 669 P.2d 410, 419 (Utah 1983).

¶27  In the insurance context, we have defined "accident" as

descriptive of means [that] produce effects [that] are not their natural and probable consequences. . . . The [natural and] probable consequence of the use of given means is the consequence [that] is more likely to follow from their use than it is to fail to follow.

*N.M. ex rel. Caleb v. Daniel E.*, 2008 UT 1, ¶ 6, 175 P.3d 566 (citing *Richards v. Standard Accident Ins. Co.*, 200 P. 1017, 1023 (Utah 1921) (omission in original). If a result is "the natural and probable

consequence of an act or course of action," it is not accidental. *N.M.*, 2008 UT 1, ¶ 6.

¶28 We determine "what is natural and probable from the insured's perspective." *Id.* ¶ 9. But we assume, unless the evidence demonstrates otherwise, that the insured is an average person who will understand the natural and probable consequences of her actions. *See id.* ("[W]e apply 'an objective test unless the evidence shows that the insured is not an "average individual."'" (citation omitted)). In other words, "[e]ach individual may be considered the average individual unless the facts disclose that in reality he is not." *Hoffman*, 669 P.2d at 419 (citation omitted). "[W]hen the facts do so show, then the question of the accidental nature of the result must be measured by this knowledge." *Id.*

¶29 For example, in *N.M.*, we acknowledged that an eight-year-old child was not the average insured because "eight–year-old children lack the experience, maturity and reasoning skills of adults." 2008 UT 1, ¶ 9. Similarly, in *Hoffman*, we suggested that the insured's mental delusions likely prevented him from understanding the consequences of his actions in the same way the average person would. 669 P.2d at 420. Thus, "when the actual state of mind of the insured can be established, the probability of [injury] resulting from certain conduct should be judged in light of that state of mind." *Id.* at 419.

¶30 This is not to say, however, that the existence of mental illness leads inexorably to the conclusion that the insured did not understand the natural and probable consequences of her actions. On the contrary, "if the insured actually knows that his or her [injury] is more likely than not to occur, the [injury] is not accidental." *Id. Hoffman* instructs the court to consider whether the insured "subjectively expect[ed]" her conduct to cause the likely consequences of her actions. *Id.* Thus, "if the insured cannot subjectively expect [her] conduct will produce [her injury] because of a mental disease or defect, the [injury] is accidental." *Id.* Where mental illness is concerned, *Hoffman* instructs that it is only where (1) the insured "is not likely to be able to appreciate the consequences of [her] conduct" or (2) "cannot control [her] conduct in light of the probable consequences" that the court should consider an occurrence to be accidental, "even though a rational person in the same circumstances would have expected [injury] to be the probable result of [her] conduct." *Id.*

¶30 The Heslops' appeal thus turns upon whether the evidence they forward to defeat summary judgment creates a genuine issue of material fact on the questions of whether Heslop (1) could appreciate the consequences of driving down the embankment or (2) could control herself from driving off the road even in light of likely injury or death.[3]

*B. Heslop did not provide evidence sufficient to create a genuine issue of material fact on the questions of whether she could appreciate the consequences of her actions and whether she could control her actions in light of their probable consequences*

¶31 The Heslops relied on two doctors' letters to show that "there is a genuine issue of material fact" as to whether Heslop had "the mental capacity to 'intentionally cause [. . .] injury to [her]self.'"

¶32 Dr. Holt's letter opined on a condition known as "serotonin syndrome":

> *Some* of the irrational behavior [Heslop] experienced, including driving her car off the road[,] *could be* contributed [sic] to the serotonin syndrome and *possible* agitated delirium and disorientation she experienced after the overdose the day prior to the incident.

(Emphases added.) Dr. Crookston's letter opined on the effects of Ambien in the system:

> [I]t is *highly likely* that Ms. Heslop was impaired cognitively and therefore could not *fully* appreciate the consequences of her actions or have the ability to *fully* control her actions.

(Emphases added.)

¶33 But neither letter supports the conclusion that Heslop failed "to appreciate the consequences of [her] conduct." *Hoffman*, 669 P.2d at 419. To be clear, under *Hoffman*, evidence supporting a reasonable inference that Heslop failed to appreciate the consequences of her

---

[3] For purposes of this analysis, we assume without concluding that Heslop forwarded sufficient evidence to create a genuine issue of material fact on the existence of a mental illness that would permit the court to analyze whether she subjectively understood the consequences of her actions.

conduct did not require Drs. Holt and Crookston to repeat verbatim the *Hoffman* test. But for Heslop to defeat summary judgment, the doctors needed to provide testimony that would allow a jury to draw a reasonable inference about Heslop's inability to appreciate the consequences of her actions. A party does not create a genuine issue of material fact when she submits evidence that simply invites the jury to speculate as to what happened. *See USA Power*, 2016 UT 20, ¶ 137. But that is what Heslop did here.

¶31 Dr. Crookston's letter provides the only evidence the jury could rely upon to conclude that Heslop could not appreciate the consequences of her actions. That letter stated that "it is *highly likely* that Ms. Heslop was impaired cognitively and therefore could not *fully* appreciate the consequences of her actions." Dr. Crookston's letter uses language similar to *Hoffman's*, but Dr. Crookston tempers his conclusion with the qualification "fully." Thus, instead of an opinion that Heslop could not appreciate her actions, Dr. Crookston's letter describes a high likelihood that she could not "fully appreciate" the consequences of those actions.

¶32 This qualified opinion did not provide the jury a basis to do anything other than speculate as to whether one of the consequences Dr. Crookston suggests Heslop may not have fully understood is the consequence at the heart of this matter—that driving a car off the road can result in injury or death. A car accident may have many consequences. The more obvious consequences involve damage to the car and injury to the driver. The less obvious consequences might include distress to those who observe the crash and the need to deploy emergency services to respond. To create a genuine issue of material fact, Dr. Crookston's letter needed to provide a reasonable basis for a jury to infer that Heslop did not comprehend that death or injury would be the consequence she would suffer if she drove off the road. Instead, Dr. Crookston's letter invites the jury to speculate as to what behavior was included and excluded by the phrase "fully appreciate." Without more specificity from Dr. Crookston, a trier of fact would be left to speculate about whether Dr. Crookston's opinion spoke to an inability to understand the seemingly obvious consequences of Heslop's actions. In other words, Dr. Crookston's opinion by itself is insufficient to support a reasonable inference that, because of Heslop's mental state, she did not understand that she would likely be hurt if she drove her car off the road. To create a genuine issue of material fact, Heslop needed to provide either a more specific opinion from Dr. Crookston or place other evidence in

the record that would allow a jury to infer that one of the consequences Dr. Crookston's statement referenced was injury or death.[4]

¶34 Moreover, the jury's ability to reasonably infer that Dr. Crookston's opinion referred to Heslop's ability to understand the consequences of leaving the road is undone by the overwhelming evidence before the district court—including Heslop's own statements—that supports a finding that Heslop did in fact appreciate that harm would result from driving off the road. Heslop told Bear River's insurance adjuster that "driving off the cliff" "was pretty much a suicide attempt." When the adjuster then asked, "and then what, you just saw an edge there and decided, you know, this is it?" Heslop replied, "Yeah." And when the adjuster asked Heslop if she had admitted to anybody else that her crash was a suicide attempt, Heslop told him, "my whole family knows . . . , I told the police[,] and all the doctors knew." Unfortunately, the evidence firmly establishes that Heslop understood that the natural and probable consequences of driving off the road would be death or

---

[4] The Heslops also contend that the district court unfairly dismissed Dr. Crookston's letter because the court noted that the source of his opinion came from reading Dr. Holt's letter rather than examining Heslop himself. *See, e.g.*, *Willey v. Bugden*, 2013 UT App 297, ¶ 28, 318 P.3d 757 ("'[W]eighing credibility and assigning weight to conflicting evidence' is not appropriate at the summary judgment stage." (Citation omitted)). The district court noted that Dr. Crookston "reviewed Dr. Holt's letter" and opined on the effects of Ambien. But the district court did not weigh evidence or dismiss Dr. Crookston's letter. Rather, it commented on the source of the doctor's knowledge—Dr. Holt's letter—just as it commented on the source of Dr. Holt's knowledge—Heslop's psychiatric interviews. But noting the foundational basis of a witness's knowledge is not weighing evidence or assessing credibility. And ultimately, the district court did not rule against the Heslops because it found that the doctor's testimony lacked credibility; it ruled that the doctors had not provided the evidence needed to create a genuine issue of material fact on the relevant questions.

injury, and Dr. Crookston's vague opinion was insufficient to permit a jury to infer otherwise.[5]

¶35 The Heslops next contend that "the possibility alone" that serotonin syndrome did, in fact, contribute to or cause irrational behavior "is enough to defeat a motion for summary judgment because a reasonable jury could find that serotonin syndrome *did* contribute to her behavior." Thus, they seem to argue that Heslop could not control her actions, even if she could appreciate them. But this claim fails for similar reasons.

¶36 In support of this contention, the Heslops again offer Dr. Crookston's letter. But in discussing Heslop's ability to control her actions on the day of the crash, Dr. Crookston's letter again equivocates. Thus, instead of a statement claiming that Heslop could not control her actions, Dr. Crookston's letter suggests a high likelihood that she could not "fully control" them. And again, this equivocal statement, standing alone, does not provide the jury with a reasonable basis to infer that Heslop could not in fact stop herself from driving off the road even though she knew she would be injured or killed.

¶37 The Heslops also contend that Dr. Holt's letter, "in and of itself, creates a genuine issue of material fact." They believe his letter "makes clear that [Heslop's] behavior was not only irrational, but that the serotonin syndrome *could have* contributed to her behavior."

---

[5] The Heslops suggest that Heslop's admission to Bear River's insurance adjuster is suspect because Heslop was under the influence of medication at the time of the incident and because "her prescription medications played a role in her behavior." But Heslop's statement to Bear River was made ten days after the crash, when Heslop had the benefits of sobriety and hindsight. What's more, none of Heslop's experts opined that her statement to Bear River was unreliable. The Heslops further argue that Heslop's statement that she "just wanted to take a drive up the canyon . . . to look at the leaves" also calls her admission into question. But Heslop's statement that she took a drive up the canyon to look at the leaves is not necessarily inconsistent with her later decision to drive her truck off the road, nor was it suspect for any reason Heslop forwards.

(Emphasis added.) But while Dr. Holt's letter unequivocally states that Heslop developed serotonin syndrome and that she was experiencing its effects the day after her accident, it suffers from the same defect as Dr. Crookston's letter: it does not opine or otherwise support a reasonable inference that Heslop could not control her actions despite their consequences when she drove off the embankment. Rather, Dr. Holt writes that "[s]*ome*" of Heslop's irrational behavior "*could* be" attributed to "*possible*" effects of serotonin syndrome. (Emphases added.) An expert opinion that a medication could have contributed to an unspecified "some of" a person's behavior does not, by itself, allow a reasonable jury to infer that that person could not in fact control herself from engaging in a specific behavior. Dr. Holt's opinion standing alone did not provide evidence that would allow a jury to do anything more than speculate as to the effect of the medication and whether one of those effects was Heslop's inability to stop herself from driving off the road.

¶38 By contrast, in *Hoffman*, Hoffman's doctor "testified that on the day of his death, Hoffman 'was psychotic and at that time *not able* to make sound rational judgments.'" *Hoffman*, 669 P.2d at 415 (emphasis added). He also testified that "because of the highly unstable nature of [Hoffman's] whole emotional state at that time, any unexpected, intense, or threatening incident would have caused a reaction of unreasonable magnitude, an unpredictable reaction." *Id*. He opined that such a reaction "was a product of Hoffman's mental illness." *Id*. This court concluded that

> on the basis of the evidence [before it,] the trial court could have found that Hoffman was suffering from a mental disease or defect that prevented him from appreciating the consequences of his conduct or controlling his conduct in light of the circumstances. [Hoffman's doctor] testified that, at the time of his death, Hoffman was unable to appreciate the consequences of his actions, i.e., he was unable to make sound rational judgments; could not control his conduct in light of the consequences; and any unreasonable and unpredictable action by Hoffman under the circumstances was a product of his mental illness.

*Id*. at 420. While Hoffman's doctor spoke in unequivocal terms regarding Hoffman's mental state, Heslop's doctors do not. Indeed, this seemed to be the district court's concern when it noted that the

doctors' letters failed to state "that [Heslop] was 'sleep driving' at the time she drove off the road, or that she [could not] remember what she did."

¶39 In the end, neither letter does the work it needed to do: provide the jury with a basis to conclude that Heslop did not understand that driving off the road would result in injury or that, even in light of that expectation, Heslop could not control herself from driving off the embankment. *See Hoffman*, 669 P.2d at 419.

¶40 The Heslops correctly argue that the test the district court needed to apply is the one *Hoffman* articulates. But the Heslops bore the burden of forwarding evidence that Heslop did not understand the consequences of her actions or that she could not control her actions. The evidence they offer, in the form of letters from Drs. Crookston and Holt, fails to create a genuine issue of material fact on either of those issues.

## II. The District Court Appropriately Granted Summary Judgment to Bear River on the Property Damage Claim

¶41 The Heslops also contend that "the district court erred in granting Bear River's motion for summary judgment on the issue of property damage coverage."

¶42 The property damage provision in the Heslops' policy provides compensation for "each direct and accidental loss of or damage to your covered car." The Heslops advance two arguments that the district court improperly granted summary judgment on this claim. First, they argue that the exclusion did not apply "for the same reasons [stated] above"—i.e., that the district court should have acknowledged a genuine issue of fact on the question of whether the crash was accidental. And we dispose of this argument on the grounds articulated above.

¶43 Second, the Heslops argue that Brandon Helsop should recover for damages to his truck because he "should be considered an accident victim." Unfortunately, this argument is inadequately briefed. "It is well established that a reviewing court will not address arguments that are not adequately briefed." *State v. Thomas*, 961 P.2d 299, 304 (Utah 1998); *State v. Wareham*, 772 P.2d 960, 966 (Utah 1989) (declining to rule on issue where defendant's brief "wholly lack[ed] legal analysis and authority to support his argument"); *State v. Amicone*, 689 P.2d 1341, 1344 (Utah 1984) (declining to rule on

separation of powers argument where argument was not supported "by any legal analysis or authority").

¶44 "In deciding whether an argument has been adequately briefed, we look to the standard set forth in rule 24(a)(9) of the Utah Rules of Appellate Procedure." *Thomas*, 961 P.2d at 305. "This rule states that the argument in the appellant's brief 'shall contain the contentions and reasons of the appellant with respect to the issues presented . . . with citations to the authorities, statutes and parts of the record relied on.'" *Id.* (citation omitted) (omission in original). "Implicitly, rule 24(a)(9) requires not just bald citation to authority but development of that authority and reasoned analysis based on that authority." *Id.* We have stated—and repeated—that appellate courts "[are] not . . . depositor[ies] in which the appealing party may dump the burden of argument and research." *Id.*

¶45 In *State v. Thomas*, we upheld the court of appeals' decision not to consider an inadequately briefed argument. *Id.* In *Thomas*, the appellant's argument cited legal authority, including two amendments to the United States Constitution and one Utah case, but contained no reasoned analysis or reference to controlling cases. *Id.* "Analysis of what this authority requires and of how the facts of Thomas's case satisfy these requirements was wholly lacking." *Id.* There, we stated that, "[w]hile failure to cite to pertinent authority may not always render an issue inadequately briefed, it does so when the overall analysis of the issue is so lacking as to shift the burden of research and argument to the reviewing court." *Id.*

¶46 In similar fashion, the Heslops' argument refers this court to one case, *Speros v. Fricke*, 2004 UT 69, 98 P.3d 28, and abruptly ends. The Heslops do not explain why *Speros* applies here or how Brandon Heslop qualifies as a victim under *Speros*. The argument also fails to identify certain material facts, for example whether Natalie Heslop was a co-owner of the truck or a co-insured on the policy. It entirely "dump[s] the burden of argument and research" upon this court to make its argument for it. *See Thomas*, 961 P.2d at 305.

¶47 While this court will not lightly toss aside partially briefed but still discernable arguments, we are limited by the practical considerations that an unbriefed argument presents. Here, we cannot determine the merits of the Heslops' claim that Brandon Heslop was a victim of his wife's car crash and is entitled to recover under the damages provision of the insurance policy. While there is no bright line between adequate and inadequate briefing, the Heslops have

not developed an argument sufficient to carry their burden of persuasion. *See Bank of America v. Adamson,* 2017 UT 2, ¶ 12, ___ P.3d ___ ("an appellant who fails to adequately brief an issue 'will almost certainly fail to carry its burden of persuasion on appeal'") (citation omitted). As such, we cannot say that the district court erred by granting summary judgment on that claim.

### III. The District Court Did Not Abuse Its Discretion when It Denied Heslop's Rule 56(f) Motion for a Continuance

¶48 The Heslops also contend that the district court abused its discretion when it denied their rule 56(f) motion for a continuance to permit additional discovery. *See* UTAH R. CIV. P. 56(f) (2014). We review a district court's grant or denial of a rule 56(f) motion for abuse of discretion. *Crossland Sav. v. Hatch*, 877 P.2d 1241, 1243 (Utah 1994). "[W]e will not reverse unless the [court's] decision exceeds the limits of reasonability." *Id.*

¶49 "Rule 56(f) allows the opposing party to submit an affidavit stating the reasons '[she] is presently unable to present evidentiary affidavits essential to support [her] opposition to summary judgment.'" *Aspenwood, L.L.C. v. C.A.T., L.L.C.*, 2003 UT App 28, ¶ 19, 73 P.3d 947 (citation omitted). That explanation "must present facts in proper form. . . . And the opposing party's facts must be material and of a substantial nature.'" *Callioux v. Progressive Ins. Co.*, 745 P.2d 838, 841 (Utah Ct. App. 1987) (omission in original) (citation omitted). "If the court finds the reasons to be adequate [it *may*] . . . order that further discovery be conducted and continue the summary judgment motion." *Aspenwood*, 2003 UT App 28, ¶ 19 (omission in original) (emphasis added).

¶50 A district court does not abuse its discretion in denying such a motion where "the reasons . . . articulated in its affidavit would produce only cumulative evidence." *Sandy City v. Salt Lake Cty.*, 794 P.2d 482, 490 (Utah Ct. App. 1990), *rev'd in part on other grounds by Sandy City v. Salt Lake Cty.*, 827 P.2d 212 (Utah 1992). A district court may deny a rule 56(f) motion for a continuance when that motion is "dilatory or lacking merit." *Price Dev. Co., L.P. v. Orem City,* 2000 UT 26, ¶ 30, 995 P.2d 1237.

¶51 Moreover, conclusory claims do not sufficiently support a motion to continue. Thus, the party opposing summary judgment must "explain how the continuance will aid [her] opposition to summary judgment." *Callioux*, 745 P.2d at 841 (Utah Ct. App. 1987); *Robinson v. Jones Waldo Holbrook & McDonough, PC*, 2016 UT App 34,

¶ 19, 369 P.3d 119 ("A district court may refuse further discovery where the plaintiff 'fail[s] to explain in [her] affidavit how additional discovery would aid [her] opposition to summary judgment.'" (alteration in original) (citation omitted)). Otherwise, overly broad areas of inquiry may suggest to a court that a party is involved in a "fishing expedition" rather than a sincere opportunity to provide the court with information that will defeat summary judgment. *See Nelson v. Target Corp.*, 2014 UT App 205, ¶ 29, 334 P.3d 1010 (stating that relevant factors in determining whether a rule 56(f) motion is warranted include "if the party requesting discovery is simply on a 'fishing expedition'" (citation omitted)).

¶52 The Heslops did not file a separate rule 56(f) motion. Instead, the "motion" consists of a five-sentence paragraph tacked onto the end of their memorandum in opposition to Bear River's motion for summary judgment. The motion fails to explain in any detail what information the Heslops wished to discover, whom they wished to depose, or what their doctors would say in addition to what they had already said. Instead, it petitions the district court broadly to grant a rule 56(f) motion for further discovery into Heslop's "mental state, capacity, the effects of serotonin syndrome, or the effects of large amounts of Ambien and Lexapro to the human system." From this request, it is unclear what specific information the Heslops believed additional time would allow them to discover.

¶53 Nothing in the Heslops' rule 56(f) motion mandated the conclusion that upon further discovery a genuine issue of material fact would arise. The breadth of the Heslops' request without an accompanying statement explaining how the continuance would aid them in opposing summary judgment suggests that the Heslops would not be able to present the district court with further evidence that would defeat summary judgment. At the very least, given the paucity of information the Heslops provided the district court about its need for additional discovery, we cannot say that the district court's denial of the rule 56(f) motion was an abuse of discretion or that its decision exceeded the "limits of reasonability." *See Crossland Sav.*, 877 P.2d at 1243 (citation omitted).

## CONCLUSION

¶54 The district court appropriately granted Bear River's motion for summary judgment on the personal injury claims. The district court correctly noted that Heslop admitted that she intentionally drove her truck off the road. The Heslops failed to provide the

district court with sufficient evidence to permit a reasonable jury to conclude that Heslop either did not understand the natural and probable consequences of driving off the road or that she was unable to control her actions. For the same reason, the district court did not err in granting summary judgment on Heslops' property damages claim that was premised on the same argument. The Heslops' claim that Brandon Heslop should be considered a victim and permitted to recover property damages is insufficiently briefed. Furthermore, the rule 56(f) motion before the district court made only conclusory claims and suggested only cumulative evidence for further discovery. We thus cannot say the district court abused its discretion in refusing to grant a continuance. We affirm the district court's grant of summary judgment.

———————