*This opinion is subject to revision before final publication in the Pacific Reporter*

**2025 UT 33**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

MILITARY AND VETERAN COUNSELING CENTER, LLC dba
FREEDOM COUNSELING,
*Appellee,*

*v.*

FELLER BEHAVIORAL HEALTH PLLC and KELLY FELLER,
*Appellants.*

No. 20240505
Heard June 17, 2025
Filed August 14, 2025

On Appeal of Interlocutory Order

Third District Court, Salt Lake County
The Honorable Teresa L. Welch
No. 210901998

Attorneys:

Freyja Johnson, Rachel Phillips Ainscough, Emily Adams,
Bountiful, Gregory N. Hoole, Salt Lake City, for appellee

Mark D. Tolman, C. Michael Judd, Elena T. Vetter, Salt Lake City,
for appellants

JUSTICE POHLMAN authored the opinion of the Court, in which
JUSTICE PETERSEN, JUSTICE HAGEN, JUDGE CHRISTIANSEN FORSTER,
and JUDGE ORME joined.

Having recused themselves, CHIEF JUSTICE DURRANT and
ASSOCIATE CHIEF JUSTICE PEARCE do not participate herein; COURT
OF APPEALS PRESIDING JUDGE MICHELE M. CHRISTIANSEN FORSTER
and COURT OF APPEALS JUDGE GREGORY K. ORME sat.

JUSTICE POHLMAN, opinion of the Court:

## INTRODUCTION

¶1    In this case, a therapy provider, Freedom Counseling, alleges that another provider, Feller Behavioral Health (FBH), misappropriated its trade secrets in violation of Utah's Uniform Trade Secrets Act. At the summary judgment stage, the district court rejected FBH's argument that Freedom Counseling failed to meet its evidentiary burden, concluding instead that the undisputed evidence showed FBH had violated the Act and deferring only the calculation of damages for trial.

¶2    We conclude that Freedom Counseling has not shown a legally sufficient evidentiary basis to support its theory of damages. Without a viable damages theory, Freedom Counseling's claim fails as a matter of law. Accordingly, we reverse the district court's denial of FBH's summary judgment motion, and as a result, we necessarily reverse the partial summary judgment award in favor of Freedom Counseling.

## BACKGROUND[1]

¶3    In 2019, a behavioral healthcare practice called Freedom Counseling employed four individuals as therapists. At the time, the therapists were exploring job opportunities outside Freedom Counseling and had begun communicating by email with Dr. Kelly Feller, executive director of FBH, regarding possible employment. In these email messages, Dr. Feller asked the therapists to share information about their contracts with Freedom Counseling, their clients, and their credentialing status with insurers.[2]

¶4    All four therapists had signed a "Non-Compete/Non-Solicitation Confidentiality Agreement" with Freedom Counseling. In it, the therapists agreed to hold "all confidential information" in

---

[1] Because this is an appeal from a summary judgment, we "recite the facts and indulge reasonable inferences in the light most favorable to [Freedom Counseling], the nonmoving party." *See Fitzgerald v. Spearhead Invs., LLC*, 2021 UT 34, ¶ 4 n.2, 493 P.3d 644.

[2] Freedom Counseling explained in its complaint that before a therapy practice can bill an insurance company for a therapist's services, the therapist must be "credentialed" on the client's insurance company's approved panel of providers. When we refer to "credentialing" in this opinion, that's what we're referring to.

confidence. The agreement defined confidential information to include "all non-public information, trade secrets, and proprietary information of [Freedom Counseling] and its Affiliates, including financial information, plans and strategy, company documents videos and training, client information and consumer and marketing information." The therapists further agreed to use confidential information only in performing their duties for Freedom Counseling, and they agreed not to disclose confidential information to anyone outside Freedom Counseling.

¶5 Dr. Feller asked three of the therapists to provide copies of their employment agreements with Freedom Counseling. In an email to two of them, Dr. Feller wrote, "I need to get a copy of the provider agreement you signed with [Freedom Counseling] as soon as possible." Dr. Feller explained that, based on his understanding, the CEO of Freedom Counseling had family members who were attorneys and FBH needed to make sure to cover its "legal bases . . . with regard to non-compete and anything else that is in the agreement." Dr. Feller made a similar request to a third therapist, asking, "Could you please send me a copy of the provider agreement you signed with [Freedom Counseling]. We want to make sure there aren't any non-compete or other legal issues." The first two therapists replied that they didn't have copies of their employment agreements; the third responded by sending Dr. Feller a link to access her agreement.

¶6 In addition, Dr. Feller sought information about the therapists' clients at Freedom Counseling who might continue to work with them if they moved to FBH. He asked one therapist, for example, "Do you have information on your clients?" Dr. Feller told the therapist that the other Freedom Counseling therapists he was communicating with had "supplied a client list with insurance coverage," which he said "was helpful in building a bridge." Each therapist ultimately provided Dr. Feller with information about their clients:

- One shared her clients' names and insurance information, including the clients' insurers, member ID numbers, co-pay amounts, and deductibles.

- Another shared her clients' names, with all but one accompanied by the client's insurer.

- A third shared her clients' names, birthdates, and insurance information, including the clients' insurers and member ID numbers.

- The last shared a list of her clients' initials (two- or three-letter abbreviations) along with their insurers. She later provided a shorter list of the full names of clients who had agreed to follow her, along with their insurers.

¶7    The email messages reveal that Dr. Feller also asked some of the therapists whether they were credentialed with their clients' insurance providers, and he inquired about the reimbursement rates they received from those insurers. Dr. Feller told one therapist that "confirmation/verification and some knowledge about *credentialing and* [*reimbursement rates*] would be very beneficial to help accelerate a successful transition." And when that therapist informed Dr. Feller that she was "individually credentialed" with all but one insurance provider and asked whether that information helped Dr. Feller to "make a decision" about her possible compensation at FBH, Dr. Feller responded, "Yes, the panels you are credentialed with and [reimbursement rates] affect compensation." He added that if the reimbursement rates were in the range she had identified, the compensation rate she requested would "work taking into consideration what you are bringing." After confirming information about the therapist's credentialing status and reimbursement rates, Dr. Feller informed her, "Based on the information we have obtained thus far to confirm client conversion, we are happy to provide the Independent Contractor Provider rate you requested . . . ."

¶8    FBH hired all four therapists. And at least forty-nine clients followed the therapists from Freedom Counseling to FBH. Freedom Counseling has since closed its business.

¶9    After the therapists joined FBH, but before Freedom Counseling initiated this suit against FBH, Freedom Counseling sued the therapists, alleging they had breached their obligations not to solicit clients and employees from Freedom Counseling and had engaged in "tortious conduct designed to injure [its] reputation and usurp the majority of its clients, thereby ruining Freedom Counseling financially and destroying the company." Freedom Counseling settled its suit against the therapists.

¶10 Freedom Counseling then initiated this lawsuit against FBH, alleging, as relevant, that FBH had violated the Uniform

Trade Secrets Act. *See* UTAH CODE §§ 13-24-1 to -9. Referencing the email communications between the therapists and Dr. Feller, Freedom Counseling claimed that FBH, through Dr. Feller, had asked the therapists for "the names and health insurance information" of their clients at Freedom Counseling even though Dr. Feller knew that the information was "protected from use or disclosure by law, ethics . . . , contracts, and fiduciary duties" and was likely stored on password-protected servers. Freedom Counseling alleged that FBH had used the client information to "make it easier to onboard Freedom Counseling's clients," to "set the compensation FBH was willing to pay . . . some of the Freedom [Counseling] employees," and to "begin preparations to make sure it would be able to bill insurance companies for the services it hoped to render" to new clients. Arguing that FBH's use of the information created an "unfair competitive and economic advantage," Freedom Counseling claimed it was entitled to recover both its "actual loss" and the "unjust enrichment" FBH gained. (Citing UTAH CODE § 13-24-4(1).)

¶11 At the close of discovery, both sides moved for summary judgment, Freedom Counseling moving for partial summary judgment on the question of liability, and FBH moving for full summary judgment on the sole claim against it.

¶12 In its motion, Freedom Counseling asked the district court to conclude as a matter of law that

- the client information[3] FBH received from the therapists met the definition of "trade secret" under the Act,[4]

- FBH misappropriated the trade-secret client information,[5]

- Freedom Counseling was entitled to damages for the "lost profits" it incurred from the misappropriation,[6] and

---

[3] The client information Freedom Counseling contends is a trade secret is the client's name coupled, in some instances, with the client insurance information.

[4] *See* UTAH CODE § 13-24-2(4) (defining trade secret).

[5] *See id.* § 13-24-2(2) (defining misappropriation).

[6] *See id.* § 13-24-4(1) (allowing damages for "the actual loss caused by" trade-secret misappropriation).

- because FBH's misappropriation was "willful and malicious," Freedom Counseling was entitled to exemplary damages equal to twice its lost profits,[7] plus attorney fees.

¶13 For its part, FBH contended in its motion that because Freedom Counseling could not meet its evidentiary burden, FBH was entitled to summary judgment. Among other deficiencies, FBH pointed to what it called a "mismatch" in Freedom Counseling's theory of damages that had developed since the complaint was filed. In FBH's view, Freedom Counseling abandoned the damages theory it originally asserted in its complaint, replacing it with a new theory that wasn't evident from the original filing. Freedom Counseling's initial theory focused on the benefit FBH gained from the client information it received from the therapists—such as streamlined client onboarding and better-informed decisions about therapist compensation. But FBH argued that Freedom Counseling later shifted to a theory based on its own losses, namely, lost profits.

¶14 This shift, FBH maintained, presented two dispositive evidentiary problems for Freedom Counseling. First, Freedom Counseling had retreated from its initial damages theory, failing to present evidence supporting it. And second, although Freedom Counseling had presented evidence—including an expert report—to support its lost-profits theory, that theory failed, too, as no "causal link" connected Freedom Counseling's lost profits to FBH's use of the claimed trade-secret information. Given these shortcomings, FBH asked the district court to enter summary judgment in its favor and dismiss Freedom Counseling's complaint.

¶15 The district court granted Freedom Counseling's motion in part and denied FBH's motion. The court agreed with Freedom Counseling that "trade secrets exist" in the case and that FBH had misappropriated the trade secrets, and it accordingly granted Freedom Counseling's motion as to FBH's liability under the Uniform Trade Secrets Act. But the court denied Freedom Counseling's motion on exemplary damages, finding disputes of fact as to whether FBH's actions were willful and malicious and

---

[7] *See id.* § 13-24-4(2) (authorizing exemplary damages up to twice the amount caused by the misappropriation if the misappropriation was "willful and malicious").

determining that those disputes prevented the court from entering summary judgment on the issue.

¶16   In denying FBH's motion, the district court concluded that the email communications sufficed to meet Freedom Counseling's burden of production. And although the court did not specifically address FBH's argument about flaws in Freedom Counseling's damages theory, the court repeatedly stated it was incorporating Freedom Counseling's briefing and oral arguments in its determination—suggesting it may have adopted those arguments wholesale.[8]

¶17   FBH asked for interlocutory review of the district court's decisions. We transferred the petition to the court of appeals, and the court of appeals granted the request. We later recalled the case for our review.

## ISSUE AND STANDARD OF REVIEW

¶18   FBH asks us to review the district court's decision to partially grant Freedom Counseling's motion for partial summary judgment and to deny FBH's motion for summary judgment. "We review a district court's legal conclusions and ultimate grant or denial of summary judgment for correctness." *Univ. of Utah v. Tullis*, 2025 UT 17, ¶ 13, 570 P.3d 367 (cleaned up).

## ANALYSIS

¶19   Freedom Counseling claims that FBH misappropriated its trade secrets. To succeed on this claim, Freedom Counseling must show that (1) a trade secret exists, (2) the trade secret was communicated to FBH "under an express or implied agreement limiting disclosure of the secret," and (3) FBH's "use of the secret

---

[8] We take this opportunity to emphasize that when a motion for summary judgment includes multiple grounds, a district court must state which of the arguments it found persuasive. UTAH R. CIV. P. 52(a)(6) ("The trial court need not enter findings of fact and conclusions of law in rulings on motions granted under [rule 56], but, when the motion is based on more than one ground, the court must issue a brief written statement of the ground for its decision."). Incorporating the winning party's arguments across the board, as the court did here, is generally unproductive because it leads the parties to guesswork and appellate courts to legwork.

. . . injure[d]" Freedom Counseling. *See USA Power, LLC v. PacifiCorp*, 2010 UT 31, ¶ 39, 235 P.3d 749 (cleaned up).

¶20 For trade-secret claims, the Uniform Trade Secrets Act is our guide, as it defines the terms "trade secret" and "misappropriation" and describes the damages a plaintiff may recover under the Act. *See* UTAH CODE § 13-24-2(4) (defining trade secret); *id.* § 13-24-2(2) (defining misappropriation); *id.* § 13-24-4 (describing damages). Here, the district court reviewed the parties' competing motions for summary judgment. In granting part of Freedom Counseling's motion, the court concluded as a matter of law that trade secrets exist and that FBH misappropriated them. And in denying FBH's motion, the court rejected FBH's contention that Freedom Counseling fell short of carrying its burden to produce evidence to support its claim, including evidence to support its damages theory.

¶21 FBH challenges these decisions. Because we agree with FBH that Freedom Counseling has not shown a legally viable damages theory, we reverse the district court's denial of FBH's motion for summary judgment. And because we reverse that denial, we necessarily set aside the court's decision to partially grant Freedom Counseling's motion.

¶22 A plaintiff cannot "establish a claim for misappropriation of trade secrets" without showing the defendant's "use of the secret that injures" the plaintiff. *USA Power*, 2010 UT 31, ¶ 39 (cleaned up). This injury requirement stems not only from our caselaw but also from the Uniform Trade Secrets Act itself. The Act authorizes damages for "both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." UTAH CODE § 13-24-4(1). In addition, if no other method is used, "the damages caused by misappropriation" may be calculated by requiring the defendant to pay a "reasonable royalty" for the "unauthorized disclosure or use" of the trade secret. *Id.* So no matter how they are calculated, the plaintiff's damages must be "caused by" the defendant's "misappropriation." *See id.* If a plaintiff cannot show that the defendant caused damages to the plaintiff through misappropriation, the claim fails.

¶23 Summary judgment is appropriate only where, viewing the facts and reasonable inferences in the nonmoving party's favor, *Suarez v. Grand Cnty.*, 2012 UT 72, ¶ 18, 296 P.3d 688, the moving party shows the lack of a "genuine dispute as to any material fact"

and an entitlement "to judgment as a matter of law," UTAH R. CIV. P. 56(a). To meet this standard, "reasonable jurors, properly instructed," must "be able to come to only one conclusion." *Clegg v. Wasatch Cnty.*, 2010 UT 5, ¶ 15, 227 P.3d 1243. And where plaintiffs bear the burden of production at trial, defendants are entitled to summary judgment if they show "that the plaintiff has no legally sufficient evidentiary basis" to find for the plaintiff on an "essential element" of its claim. *See Salo v. Tyler*, 2018 UT 7, ¶¶ 30–31, 417 P.3d 581.

¶24 Because a plaintiff must show injury and damages to establish a trade-secrets claim, *see supra* ¶ 22, FBH is entitled to summary judgment if it demonstrates that Freedom Counseling lacks a legally sufficient evidentiary basis for a jury to find that FBH's misappropriation caused Freedom Counseling any injury. FBH argues it met this standard and, thus, the district court was wrong to deny its motion for summary judgment.

¶25 To underscore its argument, FBH highlights how Freedom Counseling's damages theory changed course as the suit progressed: Initially, Freedom Counseling sought damages for FBH's alleged gain from its actions, but later Freedom Counseling pivoted to seeking damages for its own alleged losses resulting from FBH's actions.

¶26 We see why FBH takes this view. Although the complaint vaguely alluded to damages based on "the actual loss caused by FBH's misappropriation," the complaint clearly evinced Freedom Counseling's request for damages based on FBH's gain. For example, Freedom Counseling alleged that FBH asked each of the therapists for "the names and health insurance information" of their clients and that FBH "used this information" to

- "make it easier to onboard Freedom Counseling's clients,"

- "set the compensation FBH was willing to pay" some of the therapists, and

- "begin preparations" to ensure it could bill insurance companies for services it planned to provide to new clients.

The complaint also stated that FBH's use of the client information created an "unfair competitive and economic advantage," allowing FBH to "dramatically increase its number of clients overnight."

¶27 But regardless of whether Freedom Counseling shifted the focus of its damages theory from FBH's gain to Freedom

Counseling's loss, its actual-loss theory ultimately took center stage. Freedom Counseling's CEO explained at her deposition that the clinic's damages resulted from FBH "stealing" its clients. Similarly, Freedom Counseling's expert report evaluated "the economic damages resulting from the loss of stolen patients by Defendants," comparing Freedom Counseling's "economic expectations" before FBH received the client information to its "actual economic performance" afterward. Notably, the report included no analysis of FBH's financial gain from onboarding clients, setting the therapists' compensation, or preparing to bill insurance companies. And in its summary judgment and other filings, Freedom Counseling emphasized that its damages theory was always based on its "actual loss."

¶28 To proceed with its trade-secret claim, then, Freedom Counseling needed to present sufficient evidence that FBH's misappropriation of the personal client information caused its alleged losses. Yet the record fails to show any causal tie between FBH's receipt of the personal client information and Freedom Counseling's losses. Without that link, no reasonable juror could conclude that Freedom Counseling sustained damages "caused by" FBH's misappropriation, *see* UTAH CODE § 13-24-4(1), and Freedom Counseling's claim fails as a result.

¶29 Freedom Counseling resists this conclusion, arguing that FBH's access to the personal client information gave FBH the opportunity "to solicit and poach Freedom Counseling's clients." It further contends that the loss of those clients led to its closure. But the complaint never alleges that FBH *actually used* the client information to solicit or poach clients. Nor does the evidence support such a claim. To the contrary, Freedom Counseling's CEO indicated that she was unaware of any emails or texts from FBH contacting Freedom Counseling clients. She also admitted that no client had told her FBH contacted them regarding therapy services. So even if FBH could have used the client information to solicit or poach clients, no evidence shows it did.

¶30 Undoubtedly, Freedom Counseling lost clients to FBH. But those clients left for reasons other than FBH's receipt of their personal information. The most straightforward reason is that their trusted therapists moved to FBH. Indeed, the emails reflect that upon learning of their therapists' departure from Freedom Counseling, some clients chose to follow their therapists to FBH. In other words, the clients didn't leave because FBH used their

information to solicit them; they left because their therapists were leaving Freedom Counseling. That's what the available evidence shows, anyway.

¶31 Still, Freedom Counseling points out that FBH didn't hire the therapists until *after* receiving the personal client information—and that FBH used the information to help set the compensation for some of the therapists. This timing opens the door for an inference that FBH would not have hired the therapists without the personal client information. And if FBH had not hired the therapists, the clients would not have left Freedom Counseling.

¶32 To defeat summary judgment, however, an inference must be reasonable, not speculative. In assessing a motion for summary judgment, a district court need not "draw every possible inference of fact, no matter how remote or improbable, in favor of the nonmoving party." *Heslop v. Bear River Mut. Ins.*, 2017 UT 5, ¶ 21, 390 P.3d 314 (cleaned up). The court instead must "draw all *reasonable* inferences in favor of the nonmoving party." *Id.* (cleaned up). For an inference to be reasonable, it "must present something more than pure speculation," *id.*, and there must be "at least a foundation in the evidence upon which the ultimate conclusion is based," *id.* ¶ 22 (cleaned up). If no evidence supports the conclusion, the inference is mere speculation. *Id.*

¶33 Here, the evidence supports only one conclusion: FBH would have hired the therapists even without receiving the personal client information. What mattered to FBH in hiring the therapists was not the personal details of clients like insurance member ID numbers or birthdates, but how many clients a therapist might bring and whether the therapist was credentialed with the clients' insurers. Two parts of the record bear this out.

¶34 First, when one of the therapists initially shared information about her clients, she shared only the clients' initials—not their full names—along with the names of the clients' insurers (e.g., "Select Health"). Upon receiving this list of initials and insurers, Dr. Feller did not respond by asking for the personal details of the clients. Instead, he replied, "Thank you for your . . . client list with insurance information." If Dr. Feller were basing his hiring decisions on the receipt of personal client information, one would think he would have clarified that the list the therapist had provided was insufficient for his purposes.

¶35 Second, when communicating with another therapist, Dr. Feller made clear that her potential compensation at FBH depended

on two pieces of information: whether she was credentialed with certain insurers and what reimbursement rates she could expect from them. To assess that, Dr. Feller needed to know only the number of clients by insurer—not any personal client details. This is clear from an email Dr. Feller sent to the therapist that included her "client breakdown." The breakdown included just two pieces of information—the insurer's name and the number of clients who worked with that insurer—e.g., "Select Health – 6 clients." This shows that FBH would have hired the therapist even if she had provided only general client numbers and credentialing information, rather than personal insurance information about her clients. So while there may be a temporal correlation between the therapist's sharing of her client's personal information and FBH's hiring of her, the evidence does not show that the former event caused the latter.

¶36  In sum, Freedom Counseling's damages theory relies on its actual losses, yet the evidence does not support a finding that FBH's receipt of the personal client information caused those losses. On the contrary, the undisputed evidence shows that clients left Freedom Counseling because their therapists moved to FBH, not because FBH used their personal information. And although FBH did not hire the therapists until after receiving the client information, the decision to hire them was not based on FBH's receipt of the information.

## CONCLUSION

¶37  Freedom Counseling has not provided a legally sufficient evidentiary basis for its damages, a necessary element of its claim. This deficiency entitles FBH to judgment as a matter of law. We therefore reverse the district court's denial of FBH's motion for summary judgment and its award of partial summary judgment in favor of Freedom Counseling.

———————