**2021 UT 10**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

KENT SMITH, CHANDRA SMITH, EDWARD M. DUKE,
SHARON P. DUKE, and TIMOTHY SYNDERGAARD,
*Appellees,*

*v.*

DAVID ZOOK, in his capacity as the
City Manager/Recorder/Local Clerk of Nibley City,
*Appellee,*

and

RETURN DEVELOPMENT LLC,
*Appellant/Intervenor.*

No. 20200674
Heard February 17, 2020
Filed April 15, 2021

On Direct Appeal

First District, Cache County
The Honorable Brian G. Cannell
No. 200100186

Attorneys:
Daniel K. Dygert, Logan, for appellees

Eric Todd Johnson, Robert A. Patterson, Salt Lake City,
for appellee

David K. Broadbent, Christopher R. Hogle, Chelsea J. Davis,
Salt Lake City, for appellant/intervenor

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in
which CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, JUSTICE PEARCE,
and JUSTICE PETERSEN joined.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1 Nibley City enacted an ordinance approving a development project on property owned by Return Development LLC. Several citizens opposed the ordinance and collected signatures in support of a referendum petition. Some of the signatures were collected through paper "referendum packets" presented to voters in person. Others were collected through a process initiated by a document sent to voters by mail, which directed them to an online version of the referendum packet.

¶2 The Nibley City Recorder rejected the referendum petition on the ground that the signatures collected in response to the mailer were not valid, legal signatures. That decision was overruled by the district court. We reverse. We conclude that the signatures procured through the mailed document were not valid because the sponsors failed to "create" a "referendum packet" that provided "a copy of the referendum petition, a copy of the law that is the subject of the referendum, and . . . signature sheets" that were bound "together . . . in such a way that the packets may be conveniently opened for signing." *See* UTAH CODE § 20A-7-604(4). And we hold that this statutory requirement was not altered when the governor suspended enforcement of some Election Code provisions in an executive order entered in response to the COVID-19 pandemic. *See* Utah Exec. Order 2020-14 (April 3, 2020).

I

¶3 The Utah Constitution guarantees the right of voters to challenge a law by referendum "under the conditions [and] in the manner . . . provided by statute." UTAH CONST. art. VI, § 1(2)(b). Our Election Code, in turn, sets forth the conditions and manner by which voters may initiate and pursue the process for getting a referendum on the ballot. *See* UTAH CODE § 20A-7-101 *et seq*.

¶4 In the paragraphs below we first outline the statutory referendum standards that form the background of the case before us. Then we describe the process that was followed in this case, culminating in the denial of the referendum petition at issue and the district court's decision to overrule that denial on a petition for extraordinary writ.

A

¶5 A challenge to a local law is initiated when a voter, supported by five "sponsors," files an application for a

2

referendum petition with the "local clerk," the election official of the local government whose law is being challenged. UTAH CODE § 20A-7-602. The local clerk has twenty days to determine "whether the proposed referendum is legally referable to the voters." *Id.* § 20A-7-602.7(1). If the proposed referendum is deemed to be legally referable, the local clerk "furnish[es] to the sponsors a copy of the referendum petition and a signature sheet," and the sponsors "prepare the referendum for circulation by creating multiple referendum packets." *Id.* § 20A-7-604(2), (4)(a).

¶6 To collect the necessary number of signatures, the sponsors are required to "circulate referendum packets that meet the form requirements" of the code. *Id.* § 20A-7-604(1). Sponsors "may prepare the referendum for circulation by creating multiple referendum packets." *Id.* § 20A-7-604(4)(a). But all such packets must be made "by binding a copy of the referendum petition, a copy of the law that is the subject of the referendum, and no more than 50 signature sheets together at the top in such a way that the packets may be conveniently opened for signing." *Id.* § 20A-7-604(4)(b). The referendum petition identifies the law being challenged, indicates that the signers order an election, and affirms that the signers meet several requirements for signing the petition. *Id.* § 20A-7-603(1), (4). The signature sheets include columns for voters to print their names, sign their names, and write their address and date of birth. *Id.* § 20A-7-603(2)(g).

¶7 Sponsors are also directed to "include, with each packet, a copy of the proposition information pamphlet provided to the sponsors." *Id.* § 20A-7-604(4)(d). A "proposition information pamphlet" includes a "a copy of the application for the proposed . . . referendum," a written "argument prepared by the sponsors" in favor of the proposed referendum, a written "argument prepared by the county or municipality" in response to the sponsors' argument, and a copy of an "initial fiscal impact statement and legal impact statement." *Id.* § 20A-7-401.5(3). The local election official compiles all these materials to create the proposition information pamphlet and then gives a copy of the pamphlet to the sponsors. *Id.* § 20A-7-401.5(4)(b).

¶8 Sponsors must deliver all signed, verified referendum packets "to the county clerk of the county in which the packet was circulated before 5 p.m. no later than 45 days after the day on which the sponsors receive" the referendum petition from the local clerk. *Id.* § 20A-7-606(1)(a). Within thirty days, the county

clerk must then "determine whether each signer is a registered voter," "certify on the referendum petition whether each name is that of a registered voter," and "deliver all of the verified referendum packets to the local clerk." *Id.* § 20A-7-606(3). And within two days after that, the local clerk is required to determine whether "the total number of certified names from each verified signature sheet equals or exceeds the number of names required" for the referendum to qualify for the ballot—a number determined by a formula set forth in Utah Code section 20A-7-601 (which is based on the percentage of "active voters" in the county or city, with the percentage depending on the size of the county or city). *See id.* § 20A-7-607(2)(b) (incorporating the requirements of section 20A-7-601); *id.* § 20A-7-601 (setting forth requirements for different classes of counties and cities and "metro township[s]" based on population).

¶9   Some of the above requirements have been affected by an executive order entered by Governor Gary Herbert on April 3, 2020. Executive Order 2020-14 was issued pursuant to the governor's authority to "suspend the enforcement" of statutory requirements where necessary to address a declared emergency. *See id.* § 53-2a-209(4). In light of the declared "state of emergency due to novel coronavirus disease 2019 (COVID-19)," and the concern that this disease "spreads easily from person to person, may result in serious illness or death, and has been characterized by the World Health Organization as a worldwide pandemic," this executive order suspends the enforcement of certain elements of the above-noted requirements of the statutory referendum process. Utah Exec. Order 2020-14 (April 3, 2020) (suspending enforcement of parts of thirteen statutory provisions, including Utah Code sections 20A-7-606(1)(a), 20A-7-603(1)(b), and 20A-7-606(3)).

¶10 For example, the executive order suspends the requirements of Utah Code section 20A-7-603 "to the extent it requires a referendum sponsor to attach *physically* a copy of the law that is the subject of the referendum to each referendum petition" and "to the extent it requires a signature sheet to be bound *physically*." *Id.* (emphasis added). It also suspends enforcement of Utah Code section 20A-7-604 "to the extent it requires a referendum packet to be bound *physically*" and "to the extent it requires a signature sheet to be attached *physically* to a referendum packet." *Id.* (emphasis added).

B

¶11 In February 2020, the Nibley City Council adopted an ordinance approving a residential planned unit development on land owned by Return Development LLC. About a week later, Nibley residents Kent Smith, Chandra Smith, Edward Duke, Sharon Duke, and Timothy Syndergaard sought to challenge the ordinance as sponsors of a referendum petition under the above-described statutory process. The sponsors submitted their application to Nibley City Recorder David Zook, the "local clerk" under the statutory framework.

¶12 Zook furnished a referendum petition to the sponsors in accordance with Utah Code section 20A-7-604(2). And the sponsors then prepared "referendum packets" for circulation for voter signatures, as called for in Utah Code section 20A-7-604(1) & (4).

¶13 Initially, the sponsors printed standard, spiral-bound paper referendum packets and collected signatures through in-person contact. No one contends that those packets failed to satisfy the statutory prerequisites for a referendum packet. So we presume that the packets included "a copy of the referendum petition, a copy of the law being submitted or referred to the voters for their approval or rejection, and the signature sheets, all of which [had] been bound together as a unit." UTAH CODE § 20A-7-101(21).

¶14 The COVID-19 pandemic then intervened. And it interrupted the sponsors' efforts—as it did with so many aspects of so many people's lives.

¶15 The sponsors shifted their approach to gathering signatures. They prepared a new form of referendum packet and sought signatures in a new way: They printed and mailed to all Nibley City residents a two-sided document. *See* Appendix (reproducing both sides of the mailer). The front of the document had a header stating "Please Sign ASAP – Nibley Referendum for Ordinance 20-04; approval for Firefly Estates high density development near Firefly Park." Under that header was a series of bullet points summarizing the sponsors' reasons for opposing the ordinance in question—stating that this is a "high density development . . . approved for over 120 units where zoning should only allow for 40," noting that "Firefly Nature Park is immediately adjacent to the land for this high density

development," and asserting that "[t]his type of development is not what Nibley citizens envision for the character of our city."

¶16 Under those bullet points, the front side of the document next provided a means for voters to access the "referendum packet" for this referendum—through a web address or Uniform Resource Locator (URL), https://nibleycity.com/images/government/FireflyReferendum Packet.pdf. The document also stated that "Governor Herbert has suspended certain signature gathering requirements due to pandemic considerations, until Utah's emergency declaration is withdrawn." And it noted that the "signature sheet usually used for in-person signature gathering is . . . on [the] back" of the mailed document, while encouraging voters to "fill out and **physically** sign" the back page of the document, "scan or photograph the whole form," and send it "via email" to a listed email address of one of the sponsors.

¶17 The back side of the document included a header stating that it is a "REFERRAL TO THE PEOPLE OF AN ADOPTED LOCAL LAW," which was identified as "Ordinance 20-04: Residential Planned Unit Development Overlay Zone Application and Development Agreement For the Proposed Firefly Estates Development, Located at Approximately 2200 South and 1200 West." On the signature lines, the document also stated that "[b]y signing this petition, you are stating that you have read and understand the law this petition seeks to overturn."

¶18 The sponsors gathered numerous in-person signatures using the paper referendum packet. They also gathered a number of signatures through the document they mailed to voters.

¶19 On March 5, 2020, the sponsors submitted the signed, verified referendum packets to the county clerk. The county clerk then certified that the signatures were from registered voters and delivered the verified referendum packets to the local clerk.

¶20 The local clerk, Mr. Zook, confirmed that the total number of certified names on the verified signature sheets was sufficient to qualify the referendum petition for the ballot. But he determined that the signatures gathered in response to the mailed document were not "legal signatures" under Utah law. In Zook's view, the mailed document was not a "referendum packet" as required by statute because it did not contain a copy of the referendum petition, a copy of the law, a signature sheet, and a copy of the proposition information pamphlet. And because there

were not sufficient certified names without those gathered in response to the mailed document, Zook concluded that the referendum petition could not qualify for the ballot.

¶21 The sponsors filed a petition for extraordinary writ in the district court. *See id.* § 20A-7-607(4) (authorizing sponsors to challenge rejection of a referendum petition through an extraordinary writ). They asserted that the signatures submitted in response to their mailed document were valid and legal in light of the terms of Executive Order 2020-14. And they asked the court to compel Zook to accept the referendum petition and qualify it for the ballot. Return Development intervened as a matter of right to defend Zook's decision.

¶22 The district court resolved the case on summary judgment. It noted that it was undisputed that the sponsors had failed to procure sufficient signatures through in-person circulation of the paper referendum packet but that they had exceeded the statutory standard if signatures procured through the mailed document were included. And it also indicated that the facts of relevance to the mailed document were essentially undisputed—the "mailer included voter information and provided the requisite signature sheet" and "provided voters" with a "referendum packet" by identifying a URL that directed voters to a web page containing the components of the packet in a PDF file.

¶23 The court found the referendum petition "sufficient as a matter of law" under the Election Code as modified by Executive Order 2020-14. It held that the sponsors had "made available an electronic copy" of the Nibley City ordinance "and the proposition information pamphlet." It concluded that "any requirement that" sponsors "provide physical copies of all requisite documents in a bound unit is expressly suspended" by the executive order. And it granted the sponsors' motion for summary judgment and denied Zook's cross-motion on this basis, holding that the sponsors thus "have a legal right to submit" the referendum "to the voters of Nibley" before the ordinance "may take effect."

¶24 Return Development filed this appeal. We review the district court's decision on summary judgment for correctness. *Heslop v. Bear River Mut. Ins. Co.*, 2017 UT 5, ¶ 15, 390 P.3d 314.

II

¶25 By statute, the sponsors of a referendum petition are required to circulate "referendum packets" that include "a copy of the referendum petition, a copy of the law being submitted or referred to the voters for their approval or rejection, and . . . signature sheets" for voter signatures. UTAH CODE § 20A-7-101(21). Copies of all of these materials must be "bound together as a unit." *Id.* Sponsors must "create" these packets by "binding" a "copy" of their essential components "together . . . in such a way" that they "may be conveniently opened for signing" by voters." *Id.* § 20A-7-604(4)(b). A "copy of the proposition information pamphlet" must also be included if it is compiled. *Id.* § 20A-7-604(4)(d).

¶26 The enforcement of the above requirements has been suspended by Executive Order 2020-14 to some extent. But enforcement is suspended only to the extent provided expressly in the executive order. If and where the governor has not specifically suspended enforcement, statutory terms and conditions are still operative and controlling. *See id.* § 53-2a-209(4).

¶27 The executive order speaks only to provisions of the code "to the extent" they require referendum sponsors "to attach *physically* a copy of the law that is the subject of the referendum" and "to the extent" they require signature sheets or referendum packets "to be bound *physically*." *See* Utah Exec. Order 2020-14 (April 3, 2020) (emphasis added). It does not alter the more general requirement that sponsors create a referendum packet that "bind[s]" together a "copy" of the components of the packet in a single "unit" to be "conveniently opened for signing" by voters. UTAH CODE §§ 20A-7-101(21), 20A-7-604(4)(b).

¶28 These statutory requirements foreclose the central premise of the district court's decision. Under terms of the Election Code unaltered by the executive order, it is not enough for sponsors merely to make the components of the referendum packet "available" to voters. A "copy" of each component must be bound together in a single "unit" to be "opened for signing" by voters. *Id.* And the mailer at issue in this case fell short of fulfilling those requirements.

¶29 The sponsors characterize the mailer as the referendum packet. They note that the mailer included a physical signature sheet and provided electronic access to the other components of the packet by "direct[ing] voters to a URL link, which took them

to" a web page that included the referendum petition, the city ordinance, and the proposition information pamphlet.

¶30 We agree with the sponsors' characterization of the mailer as the referendum packet. And we conclude that the mailer fulfilled some of the requirements of the Election Code. As the sponsors note, the signature sheets cannot be disqualified on the ground that they were signed on paper and submitted electronically. *See* Utah Exec. Order 2020-14 (April 3, 2020) (suspending enforcement of the requirement that a signature be verified by a person "in whose presence the signature sheet [was] signed"). Yet that alone is insufficient. The Election Code also requires the sponsors to create a packet that provides a "copy" of the referendum petition and the ordinance, in a "unit" that is bound "together" to be "opened for signing" by voters. *See* UTAH CODE §§ 20A-7-101(21), 20A-7-604(4)(b).

¶31 The mailer did not include a "copy" of the referendum petition and the ordinance. A "copy" is "an imitation, transcript, or reproduction of an original work."[1] It is an actual token of a reproduced original—not a mere means of accessing it. The mailer provided a means of access but not a copy. As the sponsors explain, a voter who received the mailer "needed . . . to type the URL into a computer connected to the internet" in order to access the referendum petition, city ordinance, and proposition information pamphlet.

¶32 The mailer thus did not provide a copy or reproduction of the materials on the web page. It gave a mere means of accessing them. And that was insufficient.

¶33 The executive order did not suspend the requirement that sponsors create a packet that provides a "copy" of the components of a referendum packet in a "unit" to be "opened for signing" by voters. *See* UTAH CODE §§ 20A-7-101(21), 20A-7-

---

[1] *Copy, Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/copy (last visited Mar. 30, 2021); *see also id.* (defining copy as "one of a series of especially mechanical reproductions of an original impression"); *Copy, Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/copy (last visited Mar. 30, 2021) (defining copy as "something that has been made to be exactly like something else").

604(4)(b). And this requirement was not fulfilled by the mailer. The materials on the listed web page were not provided in a "unit" to be "opened for signing" by voters because voters had to take an additional, proactive step to access those materials instead of simply opening the unit that was provided by the sponsors.

¶34 In a pre-pandemic world, the sponsors of a referendum petition would not have been allowed to disseminate paper signature sheets and tell voters where they could find a copy of the referendum packet materials on a public website. The materials on a website would certainly be "made available" to voters. But we would not say that a person who provided a mere URL or web address to voters has provided a "copy" of those materials in the referendum packet "unit" to be "opened" by the potential signer. That same conclusion holds here. The mailer in question did not provide a reproduction or copy of the components of the referendum packet in a single unit to be opened by voters. It instead provided information that voters could use to access those components through proactive efforts of their own. And the mailer thus fell short under our law.[2]

¶35 The sponsors claim that the mailer "is no different than" an email sent to voters with "an attachment" containing all of the components of a referendum packet. But such an email arguably is different—and conceivably could comply with the statute. An email with an attachment containing the full referendum packet could be viewed as giving voters a copy or reproduction of all of the components of a referendum packet together in a single "unit" to be "opened" by voters "for signing." UTAH CODE §§ 20A-7-101(21), 20A-7-604(4)(b). But the mailer did not do that. At most it

_____

[2] The sponsors cite a memorandum from the Utah Director of Elections for their assertion that a referendum sponsor is required only to "send *or make available* an electronic copy of the referendum packet to any interested voter, so long as it 'includes' all of the required documents." But this memorandum lacks the force of law. And we repudiate it to the extent it could be read to override provisions of the Election Code that are not altered by the executive order.

gave voters access to the required components, to be reviewed through proactive efforts by voters. That was insufficient.[3]

¶36 We reverse on this basis. And we accordingly hold that the sponsors' petition for extraordinary writ fails as a matter of law.

### III

¶37 The sponsors of the referendum petition in question went to great lengths to procure voter support for their challenge to the Nibley City ordinance. And they did so at a time of great challenge—as reflected in the terms of Executive Order 2020-14. The petition for extraordinary writ, moreover, raised some important legal questions at the intersection of the Election Code and Executive Order 2020-14.

¶38 We thus commend the sponsors for their diligent efforts. But we reverse the decision granting the sponsors' motion for summary judgment because we conclude that the sponsors' referendum packet fell short of fulfilling the requirements of the Election Code—even as altered by the executive order.

─────────────

─────────────────────────────────────────────

[3] Because we reverse on this ground we stop short of resolving an alternative argument for reversal—the assertion that the mailer presented bullet-points of advocacy in favor of the referendum that are not in line with the terms of and conditions for a "proposition information pamphlet."

APPENDIX I



## Please Sign ASAP - Nibley Referendum for Ordinance 20-04; approval for Firefly Estates high density development near Firefly Park

- A high density development was approved for over 120 units where zoning should only allow for 40.
- Local schools could have three times greater impact from high density than the low density for which it is zoned.
- This type of development is not what Nibley citizens envision for the character of our city.
- Firefly Nature Park is immediately adjacent to the land for this high density development.
- No tax increase will occur as a result of this high density development being denied.
- Financial benefits to the city would still be possible under a low density development, although to a lesser extent.

****************ECRWSS****

Local
Postal Customer

### What are the details?
- See URL for referendum packet below. Signature gathering efforts must direct voters to this packet so they can make an informed decision.
- https://nibleycity.com/images/government/FireflyReferendumPacket.pdf

### Who can sign?
- Must be a resident of Nibley. Having recently voted is not a requirement.
- Must be a registered voter, or complete registration by the **May 13th deadline for signature collection** (see following URL for voter registration).
- https://secure.utah.gov/voterreg/index.html

### How do I submit my signature? (It's easy!)
- Governor Herbert has suspended certain signature gathering requirements due to pandemic considerations, until Utah's emergency declaration is withdrawn.
- The same signature sheet usually used for in-person signature gathering is to be used and is on back.
- You and other voters in your household can fill it out and **physically** sign it, then scan or photograph the whole form.
- The image can then be sent via email to edwardmduke@aol.com

**Please share with all your friends and neighbors in Nibley so this important matter can be put to a vote of the people!**

000083

---

**REFERRAL TO THE PEOPLE OF AN ADOPTED LOCAL LAW, WHICH IS:**

**Ordinance 20-04: Residential Planned Unit Development Overlay Zone Application and Development Agreement For the Proposed Firefly Estates Development, Located at Approximately 2200 South and 1200 West**

WARNING: It is a class A misdemeanor for an individual to sign a referendum petition with any other name than the individual's own name, or to knowingly sign the individual's name more than once for the same measure, or to sign a referendum petition when the individual knows that the individual is not a registered voter and knows that the individual does not intend to become registered to vote before the certification of the petition names by the county clerk.

| Office Use Only | Registered Voter's Printed Name (must be legible to be counted) | Signature of Registered Voter | Date Signed | Street Address, City, Zip Code | Birth Date or Age (optional)** |
|---|---|---|---|---|---|
| | | | | | |
| | *By signing this petition, you are stating that you have read and understand the law this petition seeks to overturn.* | | | | |
| | | | | | |
| | *By signing this petition, you are stating that you have read and understand the law this petition seeks to overturn.* | | | | |
| | | | | | |
| | *By signing this petition, you are stating that you have read and understand the law this petition seeks to overturn.* | | | | |
| | | | | | |
| | *By signing this petition, you are stating that you have read and understand the law this petition seeks to overturn.* | | | | |
| | | | | | |
| | *By signing this petition, you are stating that you have read and understand the law this petition seeks to overturn.* | | | | |
| | | | | | |
| | *By signing this petition, you are stating that you have read and understand the law this petition seeks to overturn.* | | | | |
| | | | | | |
| | *By signing this petition, you are stating that you have read and understand the law this petition seeks to overturn.* | | | | |

** Birth date or age information is not required, but it may be used to verify your identity with voter registration records. If you choose not to provide it, your signature may not be verified as a valid signature if you change your address before petition signatures are verified or if the information you provide does not match your voter registration records.

000084